[Civ. No. 612. Fourth Appellate District.—November 6, 1933.]

ROY SKOUSEN, Respondent, v. GEORGE HERZ et al., Appellants.

William Guthrie and P. N. McCloskey for Appellants.

Duckworth & Harrison for Respondent.

MARKS, J.—This action was brought by the respondent against appellants to recover money alleged to be due for labor performed under the terms of a subcontract which provided for the doing of portions of the work of construction of a section of the state highway between Black Butte and a point one and one-half miles west of Hopkins Wells in Riverside County. The Colton National Bank was joined as defendant under an allegation that it claimed some interest in the results of the controversy. Judgment was rendered in favor of respondent in the sum of $2,575.29, and costs, and the Citizens National Bank of Colton, successor of the Colton National Bank, for $4,700.21, which has been paid, leaving only the judgment in favor of respondent involved here.

The complaint contained six causes of action, and the answer of appellants nine counterclaims. Only one of each

is considered in the briefs. The fourth cause of action of the complaint alleges that respondent performed extra work in preparing the roadbed for what was called "select materials", which extra work was of the reasonable value of $3,744. The trial court found this sum to be its reasonable value but did not include the amount in the judgment. The counterclaim in question alleged that respondent abandoned his contract before its completion and that appellants were compelled to expend the sum of $2,352.94 in completing the work. The trial court found against this allegation.

Appellants had a contract with the department of public works, division of highways of the state of California, to do all of the work of grading and paving the road in question. Their subcontract with respondent made in November, 1928, is very brief and its very brevity is the seeming cause of this action. The sole description of the work to be performed by respondent is there set out as follows: "Whereas, the party of the first party (appellants) desires to sublet a portion of the work provided to be done in and by said contract to the party of the second part (respondent); now, therefore, it is agreed by and between the parties hereto as follows, to-wit: That the said party of the second part agrees to do all of the work provided for in and by said contract of said party of the first part with the State of California, designated therein as Items Nos. 1 and 2."

In the "Standard Specifications" used for the work, we find this definition of the word "contract": "The written agreement covering the performance of the work and the furnishing of labor and materials in the construction of the work. The Contract shall include the Notice to Contractors, the Proposal, Plans, Specifications, Special Provisions and Contract Bonds; also any and all Supplemental Agreements amending or extending the work contemplated and which may be required to complete the work in a substantial and acceptable manner." Taking this broad definition of the contract we find the following explanation of "*Items No. 1 and 2*" in the "Notice to Contractors": "Item 1. .139,000 cubic yards roadway embankment. Item 2. 550,000 station yards overhaul." In the "Proposal" these items are set forth as follows: "Item 1—Approximate Quantity—139,000 cubic yards roadway embankment at twenty-

nine cents per cubic yard—Unit Price—$.29—Total $40,-310.00. Item 2.—Approximate Quantity — 550,000 station yards overhaul at one-half cent per station yard—Unit Price—$.005—Total — $2,750.00.'' This is exactly repeated in the "contract", by which word we now mean the instrument that was executed by appellants and the department of public works, division of highways.

There is no controversy here over the amount fixed and allowed by the trial court for "station yards overhaul". (Item No. 2.) We are only concerned with that work which was included within Item No. 1. The contract, and subcontract, of themselves furnish no complete description of the work to be included under "Item No. 1". Appellants contend that "Item No. 1" included the excavating of a rectangular depression twenty feet in width and between six and twelve inches in depth along the center of the entire roadway to receive "Imported Selected Materials" which were to furnish a foundation for the crushed rock or gravel or hard surface, and the shaping and finishing of the shoulders and gutters. Respondent contends that "Item No. 1" did not include either.

If we are to find any satisfactory description of the work which was to have been done by respondent under Item No. 1, we must look to the "General Specifications" for it. Under the heading "Embankment" we find nineteen paragraphs describing its construction. The only assistance we find there is the following: "Where immediate paving is contemplated, or whenever provided for in the special provisions, embankments shall be carried up in layers as above described, and in addition each layer shall be watered sufficiently to dampen the material. It shall then be thoroughly rolled with a roller complying with the requirements of article (y) of this section, and the surface of each layer shall be uniformly compacted before the next layer of embankment is placed thereon. Upon the completion of the embankment, preliminary to making subgrade, it shall be watered thoroughly by use of pipe-lines and hose." Under "Subgrade" is the following: "(a) Description.—The subgrade will be considered as that portion of the highway upon which surfacing or paving is to be placed. Before the surfacing or paving is placed, a subgrade shall be constructed, conforming to the grades and cross-sections shown

on the plans and in accordance with these specifications. The finished subgrade shall be true to cross-section, hard, uniform, smooth and must support without perceptible indentation, the wheels of heavily loaded trucks, except where the soil is too sandy. (b) When the surface of the grade is finished to a flat cross-section, and is rolled smooth and compact, it will be considered as ready for the Engineer's subgrade stakes. . . . (g) Payment.—The cost of furnishing all labor, materials, tools, implements and equipment and of doing all work incidental to shaping the subgrade shall be considered as included in the price paid for macadam or crushed gravel or stone surfacing and no additional allowance will be made therefor." Under the heading "Standard Road Surfacing, Crushed Gravel or Stone" the following appears: "(h) Payment.—The price paid per ton or per cubic yard for crushed gravel or stone surfacing shall include preparing the subgrade, furnishing, hauling and placing the crushed gravel or stone and all incidental work." Under the heading "Shoulders" is the following: "(b) Payment.—The cost of furnishing all labor, materials, tools, implements, and equipment and doing all work incidental to constructing and shaping the shoulders shall be considered as included in the price paid for grading and no additional allowance will be made therefor."

In the "Special Provisions" for the construction of the road there is a detailed drawing of a cross-section of the road. A straight line passes through what is marked "Imported Selected Materials" and is called "Flat Section for Rough Grading". At a distance representing eighteen inches above is another straight line marked "Finished Grade". Of course, the cross-section shows the shoulders and gutters finished to grade with the completed excavation for the "Imported Selected Materials".

In the same specification the following appears: "Where sandy subgrade is encountered, a blanket of selected subgrade material shall be spread on the grade as shown on the following typical cross-sections and to such a height that it will compact to finished subgrade elevation . . . Selected subgrade material will be measured in excavation at the pit and will be paid for at the price per cubic yard for imported selected material, which price shall include full compensation for excavating, loading, hauling, depositing and

shaping the material and all incidental work connected therewith.''

In an attempt to enlighten the trial court on the meaning of Item No. 1 as applied to this case, appellants produced R. L. Young, an inspection engineer for the state highway department, as a witness in their behalf. Mr. Young had assisted in the preparations of the estimates, plans and specifications, and later had inspected the work. He testified that respondent had moved 139,241 cubic yards of material under the provisions of Item No. 1. He cited sections of the general specifications under headings such as ''Grading'', other than those from which we have quoted, as throwing light on the question at issue. His evidence tends to support the contention of appellants, though our study of it leaves us with the opinion that it is far from conclusive.

Had the trial court found that Item No. 1 included the finishing of the shoulders and gutters by respondent but did not impose upon him the duty of excavating and shaping the center of the roadway to receive the imported selected materials, such a finding would have had evidentiary support. This would have resulted in an increase in the amount recovered by respondent.

The trial court found that the parties had placed a practical construction on the contract during the progress of the work, whereby appellants were required to complete the shoulders and gutters, and respondent was obligated to prepare the excavation for the selected imported materials. While the evidence is sharply conflicting on this issue, there is material and competent evidence to support this finding.

The circumstances under which parties may put a practical construction upon a contract are clearly set forth in the following authority cited by appellants: (6 Cal. Jur. 304.)

''The intention of the parties is to be ascertained from the writing alone, if possible, and not from the subsequent actions of one of them. However, it is well recognized that the terms of a contract may be manifested by conduct when not stated in words. And where the meaning is doubtful, the acts of the parties done under a contract afford one of the most reliable means of arriving at their intention. The law recognizes the practical construction of a contract as the best evidence of what was intended by its provisions.

'Contemporaneous exposition is in general the best.' Parties to a contract have a right to place such an interpretation upon its terms as they see fit, even when such an interpretation is apparently contrary to the ordinary meaning of its provisions. It is to be assumed that they best know what was meant by its terms, and are the least liable to be mistaken as to its intention; that each party is alert to his own interests, and to insistence on his rights, and that whatever is done by them contemporaneously with the execution of the contract is done under its terms as they understood and intended it should be. They are, it has been said, far less liable to have been mistaken as to the intention of their contract during the period while harmonious and practical construction reflects that intention, than they are when subsequent differences have arisen, and one of them seeks a construction at variance with the practical construction they have placed upon it. But, in construing acts or expressions as constituting interpretation by the parties of a written contract at variance with the ordinary import of its terms, it is a cardinal rule that it ought to appear with reasonable certainty that they were acts of both parties, done with knowledge, and in view of a purpose at least consistent with that to which they are later sought to be applied. The parties, in all fairness, should be bound by the construction placed by themselves upon their agreement. The legal effect of their conduct is a question for the court. It is only in relation to contracts that are uncertain, or of doubtful construction on their face, that conduct is to be looked to in aid of construction. Where the terms are plain and certain, the court will be guided by the language used and construe the intention of the parties to have been in accordance with their agreement. Where its terms are clear and explicit, the meaning not doubtful, and there is no latent ambiguity, a contract cannot be varied by subsequent conduct of the parties showing their understanding that a right under it was several and not joint, or by surrounding circumstances. The parties must be deemed bound by the contract, regardless of the results produced.''

We are of the opinion that the facts of the instant case show that the terms of the contract in question are sufficiently uncertain, and the meaning of its terms so doubtful, that the parties might put a practical construction upon it.

There being evidence in the record to support this finding of the trial court, we are bound by it on appeal.

It should be again observed that had the trial court taken the other permissible view of the case, namely, that appellants should have recovered their costs of shaping and finishing the shoulders and gutters, and that respondent should have had included in the judgment his cost of making and shaping the excavation for the imported selected materials, the result would have been an increase in the judgment against appellants. Respondent is not here complaining of this.

Judgment affirmed.

Barnard, P. J., and Jennings, J., concurred.