[Civ. No. 1744.   Fourth Appellate District.—November 13, 1935.]

T. L. HILL, Petitioner, v. INDUSTRIAL ACCIDENT COMMISSION and LULU VICKERS et al., Respondents.

Claflin & Dorsey for Petitioner.

Everett A. Corten for Respondents.

MARKS, J.—This is a proceeding to review an order of the Industrial Accident Commission awarding Lulu Vickers compensation against T. L. Hill for injuries sustained in the course of and arising out of her employment by Hill, and discharging from liability the National Automobile Insurance Company, the purported insurance carrier for Hill. For brevity we will refer to the Industrial Accident Commission as the commission, and the National Automobile Insurance Company as the company.

It is admitted that Mrs. Vickers was the employee of Hill, that she was injured in the course of her employment and that

her injury followed from a risk of employment. The sole questions presented are whether the company insured Hill, and if so, whether the policy was cancelled prior to the date of the injury of Mrs. Vickers on April 8, 1934. In other words, is the finding of the commission that Hill was uninsured at the time of the accident supported by any evidence? A determination of these issues requires a careful consideration of the evidence which we believe necessary for the guidance of the commission in further proceedings before it in this cause.

Collins & Mortensen, a copartnership of Bakersfield, California, to whom we will refer as the agent, was appointed by the company as "its agent for the purpose of securing for the company acceptable applications for policies and the collection of premiums therefor", as appears from the agency contract. That document contains the following provisions:

"FIFTH: The Company shall render monthly statements of all business written and premiums due from the Agent and the Agent shall remit in full therefor for all moneys collected, or for all premiums included in Conditional Sales Contract, Title Retaining Note or subject to Chattel Mortgage, on or before the 15th day of the month following the date of the collection of such moneys or the issuance of such documents, and within forty-five days after the last day of the month, in which the insurance becomes effective, *except when any policy provides payment as a condition precedent to effectiveness of such policy, the premium must be paid as therein provided.*

"SIXTH: If the original or subsequent premiums written on policies under this contract are not paid to the Company within sixty (60) days from the date of the issuance of the policies or renewals thereof, on which such premiums apply, the Company reserves the right to collect such outstanding premiums and if collected by the Company, the Agent shall receive no commission thereon, and Agent agrees to promptly remit to insureds any and all return premiums under policies or declaration certificates of this Company, and all return commissions, as per above commission schedule, on such return premiums are to be paid to the Company upon demand."

The policy in question contained no provisions requiring the payment of the premium as a condition precedent to its effectiveness.

About the middle of February, 1934, Hill applied to the agent for a policy of employer's liability insurance. The application was forwarded to the office of the company in San Francisco and a policy was written. This policy and some of its endorsements bore the date of February 19, 1934. Other endorsements bore date of February 16, 1934. The completed policy was sent by mail to the agent in Bakersfield. It called for an advance premium payment of forty dollars.

Hill testified that he met Mortensen away from the agent's office and had a conversation with him in which Mortensen informed him that the policy had been received. Hill further testified that he asked Mortensen to hold the policy in his office until he called for it and that Mortensen replied "Okey.". Mortensen admitted meeting Hill at the place specified but did not remember the conversation detailed by Hill.

An employee of the agent testified that on March 1, 1934, she mailed Hill a bill for the advance premium of forty dollars. Hill denied receiving this bill. The same employee testified that at some time prior to March 14, 1934, she had a telephone conversation with Hill during which he stated that the advance premium on the policy was too high and that he could secure a policy from the state compensation insurance fund at less cost. While there is a conflict in the evidence as to this conversation there is no evidence suggesting any express direction from Hill that the agent have the policy cancelled.

The policy was returned to the San Francisco office of the company where the following endorsement was placed on its back: "Cancelled Non-payment E. P. (Earned premium) 11.62 R. P. (Returned Premium) 28.38 Date 3–14–34 May 3 1934 Northern Agents." The words in parentheses are the explanations given by witnesses for the company of the preceding abbreviations.

Under date of March 20, 1934, a document entitled "Request for wage statement" was mailed to Hill from the San Francisco office of the company. This requested a statement from Hill of "the total compensation of all employees from February 16th 1934 to March 14th 1934, covered by Workmen's Compensation Policy No. C 41218", which is the one we have been discussing. Above the last printed paragraph

on the request for wage statement the words "cancellation audit" are typed. Hill denied ever receiving this document.

On April 13, 1934, the company wrote Hill as follows:

"Kindly refer to our request on March 20th for Wage Statement covering the period of February 16th, 1934 to March 14th, 1934.

"It is imperative that we have this Wage Statement in order to complete our adjustment of this Policy."

It should be noted that this letter was dated six days after Mrs. Vickers had been injured.

On May 3, 1934, and after the company had been notified of the injury of Mrs. Vickers and of her claim for compensation, the company enclosed its bill of $11.62 against Hill in the following letter to him: "We are enclosing a statement showing an earned premium due us on the above policy covering the period of February 16, 1934 to March 14, 1934. Inasmuch as the deposit premium was not paid to us we were forced to cancel the Policy for Non-Payment of Premium. We must ask that you let us have your check covering the amount as shown on our statement not later than May 14th, 1934." At a hearing before the commission on December 3, 1934, the manager of the San Francisco office of the company testified that it was his understanding that the bill for $11.62 against Hill had been handed to the company's attorney for action. It is admitted that no part of the premium has been paid, but Hill testified that he was willing and able to pay it when its amount was determined.

The manager of the San Francisco office of the company testified as follows concerning credit extended to the assured: "Q. Mr. Burton, what is the custom in the business of extending credit? It is always customary to extend thirty to sixty days time, isn't it? A. Well, as far as extension of credit is concerned, you understand that the companies operate in a manner whereby the so-called agent is virtually representing the employer. Now, we extend, under ordinary circumstances, credit to the agent. Now, what extension of credit he may extend to the employer within that time that we allow him, why that is something that we do not know about. Q. What do you allow him, fifteen days after the month succeeding the date of the policy? A. Well, ordinarily, unless it is designated to the contrary, we allow them until the 10th of the month following in which the business is written, and

that is paid by the 28th, then it is subject to cancellation. Q. In the ordinary course of business this policy issued in March would be subject to cancellation April 28th, or would it be May 28th? A. No, it was dated February. Q. So the normal cancellation would be April 28th, primary notice on April 10th, thirty days following the month in which it was issued? A. Yes, that is correct. Q. That would be the normal way? A. Yes.''

The policy contains the following provisions concerning cancellation: ''This Policy may be cancelled at any time by either of the parties upon written notice to the other party stating when, not less than ten days, thereafter, cancellation shall be effective. The effective date of such cancellation shall then be the end of the Policy Period. . . . Notice of cancellation shall be served upon this Employer as the law requires, but if no different requirement, notice mailed to the address of this Employer herein given shall be a sufficient notice, and the check of the Company, similarly mailed, a sufficient tender of any unearned premium.''

In approaching the problem of the questioned finding of the commission being supported by any evidence, we will entirely disregard all of Hill's evidence tending to deny conversations with the agent, the members of the partnership and its employees. If there is any evidence supporting the finding we cannot disturb it here.

The findings of the commission that the company was not the insurance carrier of Hill at the time of Mrs. Vickers' injury and that he was wilfully uninsured seem to have been based on three conclusions, (1) that the policy was never delivered; (2) that no extension of credit was given him; (3) that the policy was cancelled. The evidence on the first two conclusions is interlocking and we will consider them together.

The rules governing delivery of a policy of insurance are clearly set forth in 14 California Jurisprudence, page 425, as follows:

''The rule as to the delivery of insurance policies and other written instruments is the same, under the code, as the rule in regard to grants. Hence, the policy takes effect upon delivery, which is presumed to have been on its date, in the absence of evidence to the contrary. The policy becomes the property of the insured after delivery.

"Delivery is absolute, and thereupon the policy becomes effective, discharged of any condition on which delivery was made. Thus it is settled that when a contract of insurance is executed with a full knowledge of an existing fact which would render it void under a condition precedent embodied therein, the condition will be considered as waived, since otherwise it would be an unmeaning form, the only effect of which would be to deceive and defraud. It has been held, accordingly, that an express provision in a policy that the company shall not be liable until the premium is actually paid, is · waived by the unconditional delivery of the policy as a completed and executed contract, under an express or implied agreement that a credit shall be given for the premium; and the company is liable for a loss which may occur during the period of credit..

"A policy is constructively delivered when, by agreement of the parties at the time of execution, it is understood to be delivered, and under such circumstances that the insured is entitled to immediate delivery. Constructive delivery is a matter of intention. If it was intended that the policy should be in force before it actually reached the hands of the insured, it will be deemed constructively delivered. Moreover, it seems that if the insurer so far accepts the application as to prepare and forward a policy to its agent for delivery, and if payment of the premium has been made or waived or is not a condition of the policy's taking effect, the contract is then complete, and the insurer cannot revoke acceptance, though the policy has not been delivered. Delivery is complete, therefore, when the policy is sent to the local agent to be unconditionally delivered, and though lost on the way, it is nevertheless the property of the insured.''

The policy in question, being a written instrument, did not take effect until its delivery. (Secs. 1626, 1627, 1054, Civ. Code.) It follows that in the absence of its delivery, either actual or constructive, the policy could not have been in force and no mutual rights or obligations between the insurer and the insured could have arisen under it. The company would not have been obligated to protect Hill against the claim of an injured employee and the insured would have had no obligation to pay any portion of the premium.

In the case of *Harrigan* v. *Home Life Ins. Co.*, 128 Cal. 531, at page 547 [58 Pac. 180, 61 Pac. 99], the Supreme Court

quoted with approval from the case of *Hallock* v. *Commercial Ins. Co.*, 26 N. J. L. 268. In that case a policy of insurance was delivered by the insurer to its agent, Breck, but was not manually delivered to the insured. The New Jersey court said: "Breck, the agent, and the mail were only the vehicles to carry it to him, and it was the same thing as if mailed or sent directly to the plaintiff. The defendants suggest in answer that Breck was their agent, and that by sending it to him they did not part with the possession of the policy, and that they only gave authority to Breck to deliver, which they could and did revoke before actual delivery. But when they mailed the policy to Breck to deliver, they did not constitute him their agent to receive it and keep it for them, nor to retain it as their agent. . . . It was a delivery to Breck to deliver it to plaintiff, which was a good delivery to plaintiff."

There is no direct evidence of any express agreement to extend Hill credit or time within which to pay the advance premium. It is admitted that the agents had authority to extend him credit. On March 1, 1934, the agent mailed a bill to Hill for the amount of the advance premium. This was at least ten days after the policy had been issued and received by the agent and was the first demand made upon Hill for payment of the advance premium. This rather conclusively shows that credit had been extended to him for at least that time.

The most conclusive evidence that the policy had been delivered, that credit had been extended Hill and that the policy was in full force and effect up to March 14, 1934, is the determined effort of the company to collect the earned premium up to that date and after the injury of Mrs. Vickers and after it had been fully advised of all of the facts of the case. This is an admission on its part that the policy had been delivered, for without its delivery no part of the premium could have been earned. It is also an admission that credit had been extended to Hill at least to March 14, 1934. It is also an admission that the policy was in full force and effect up to that date.

It seems too clear for argument that Hill believed he was insured and that the company believed that it was his insurance carrier up to at least March 14, 1934. It seems to us that the parties to the insurance contract by their conduct have placed a practical interpretation on the questions of

delivery and extension of credit that must be construed as binding on the commission and on this court. In *Mitau* v. *Roddan,* 149 Cal. 1, at page 14 [84 Pac. 145, 6 L. R. A. (N. S.) 275], the Supreme Court said: ''Parties to a contract have a right to place such an interpretation upon its terms as they see fit, even when such an interpretation is apparently contrary to the ordinary meaning of its provisions. And in all cases where the terms of their contract, or the language they employ, raises a question of doubtful construction, and it appears that the parties themselves have practically interpreted their contract, the courts will follow that practical construction. It is to be assumed that parties to a contract best know what was meant by its terms, and are the least liable to be mistaken as to its intention; that each party is alert to his own interests, and to insistence on his rights, and that whatever is done by the parties contemporaneously with the execution of the contract is done under its terms as they understood and intended it should be. Parties are far less liable to have been mistaken as to the intention of their contract during the period while harmonious and practical construction reflects that intention, than they are when subsequent differences have impelled them to resort to law, and one of them then seeks a construction at variance with the practical construction they have placed upon it. The law, however, recognizes the practical construction of a contract as the best evidence of what was intended by its provisions. In its execution, every executory contract requires more or less of a practical construction to be given it by the parties, and when this has been given, the law, in any subsequent litigation which involves the construction of the contract, adopts the practical construction of the parties as the true construction, and as the safest rule to be applied in the solution of the difficulty. (*Mayberry* v. *Alhambra etc. Co.,* 125 Cal. 446 [54 Pac. 530, 58 Pac. 68] ; *Keith* v. *Electrical Engineering Co.,* 136 Cal. 178, 181 [68 Pac. 598].)'' See, also, *Kales* v. *Houghton,* 190 Cal. 294 [212 Pac. 21] ; *Rosenberg* v. *Geo. A. Moore & Co.,* 194 Cal. 392 [229 Pac. 34] ; *Katz* v. *People's Finance etc. Co.,* 101 Cal. App. 552 [281 Pac. 1097] ; *Work* v. *Associated Almond Growers,* 102 Cal. App. 232 [282 Pac. 965] ; *Skousen* v. *Herz,* 135 Cal. App. 116 [26 Pac. (2d) 498].

We therefore conclude that the evidence establishes beyond question that there was a constructive delivery of the policy

to Hill and an extension of credit to him. It follows that the policy was in full force and effect from the date of its constructive delivery in February, 1934, until its cancellation, if it was ever lawfully cancelled.

It is admitted that no formal notice of cancellation of the policy was mailed or otherwise sent or delivered to Hill before the time of the injury of Mrs. Vickers. The company relied upon the ''request for wage statement'' mailed to Hill on March 20, 1934, as being a notice of cancellation. Hill denied receiving this instrument but we will disregard his testimony and assume that it was delivered to him through the United States mail. The only reference to a cancellation of the policy was the words ''cancellation audit'' typed on the lower left portion of the page. These words cannot be construed into a notice that the policy was being cancelled or was going to be cancelled at a future date. The maximum information which they might convey on the subject was that the company might be preparing to take steps to cancel the policy. The words fell far short of the information concerning cancellation which the company bound itself to give Hill in the policy issued to him. In that instrument it was provided that to effect a cancellation it must give ''written notice to the other party stating, when, not less than ten days thereafter, cancellation shall be effective''. It could not cancel its policy by any notice short of the one it had bound itself to give. It did not give such a notice of cancellation. The policy having been prepared by the insurance company its terms must be construed against it and it must be held bound by them. (*Witherow* v. *United American Ins. Co.,* 101 Cal. App. 334 [281 Pac. 668].)

In the instant case we conclude that the policy was issued and delivered by the company and not cancelled by it prior to the injury of Mrs. Vickers. The challenged findings of the commission are not only without evidentiary support but contrary to all of the undisputed evidence in the case. The commission urges that as there were conflicts in the evidence its findings must be sustained. This contention is without merit. There are no conflicts in that evidence upon which we must rely to support the conclusion that the policy was delivered, credit extended and no cancellation effected. The only conflicts in the testimony are upon matters immaterial to a decision of the three questions of importance here.

The award of the commission against T. L. Hill, and dis-missing the National Automobile Insurance Company and relieving it from all liability upon the claim of Lulu Vickers, is annulled and the cause is remanded to the commission for further proceedings.

Barnard, P. J., and Jennings, J., concurred.