[Civ. No. 438. Fifth Dist. June 21, 1965.]

HARTFORD ACCIDENT AND INDEMNITY COMPANY, Cross-complainant and Appellant, v. DAVID McCULLOUGH et al., Cross-defendants and Respondents.

Frederic A. Jacobus and Robert E. Bradstreet for Cross-complainant and Appellant.

Sherman Rogers for Cross-defendants and Respondents.

CONLEY, P. J.—This litigation had its inception in an automobile collision which occurred on January 28, 1962, on Road 132, near its intersection with Avenue 80, in Tulare County, between a 1949 Ford sedan owned of record by Herbert Frost and driven by Danny Lee Burns, and a 1954 Plymouth sedan owned and operated by David McCullough.

Wanda Burns was the mother of Danny Lee Burns, the minor, who was driving the Ford sedan. Louise Lee and Jerry Lee, Jr. were seated in the McCullough car.

This action was originally brought by Wanda Burns and her minor son against the Hartford Accident and Indemnity Company, hereinafer called Hartford; plaintiffs sought declaratory relief and recovery for breach of contract, claiming the existence of a policy of insurance issued by Hartford to Lowe C. Burns, deceased husband of Wanda Burns, and that said policy by its terms covered the Burns family for injuries of Danny and damages sustained by plaintiffs.

The clerk's transcript also indicates that David McCullough, Louise Lee, and Jerry Lee, Jr. filed a separate suit for personal injuries against Danny Lee Burns, Wanda Burns, and Herbert W. Frost, which has not as yet been tried.

In the instant action, Hartford filed a cross-complaint against Wanda Burns, individually, and as guardian ad litem of Danny Lee Burns, David McCullough, Herbert W. Frost, Louise Lee, the Estate of Jerry Lee, Jr., and one Donald Bonkosky; in the first cause of action of the cross-complaint, the insurance company averred that the insurance policy previously issued to Lowe C. Burns, no longer applied because of a breach of contract by the Burns family in failing to give it notice of the accident for a period of at least 12 months after it occurred, with the consequence that Hartford suffered actual prejudice by being unable to make a timely investigation of the accident, or possibly by settling claims arising from the collision on a favorable basis. In the second cause of action contained in the cross-complaint, Hartford referred to Mr. McCullough's request for a policy of insurance, and the agreement of the company to issue it conditioned upon the payment of the proper premium; it was alleged that said cross-defendant failed to pay any premium; that no such policy was ever in effect, and that, in any event, it had been legally cancelled prior to the accident; consequently, the inclusion therein of a clause protecting the occupants of the McCullough automobile in the event of a collision with an uninsured motorist was never effective.

After hearing the evidence, the court signed findings of fact and conclusions of law and a judgment in which it was held that Wanda Burns and Danny Lee Burns had in fact been insured by the policy referred to in the first cause of action of the cross-complaint, but that they had failed to notify the

insurance company of the occurrence of the accident for 12 months, thereby causing such actual prejudice and damage to Hartford as to make the policy inapplicable. There was no appeal by any party as to that portion of the judgment, and it has become final.

The appeal applies only to the findings and judgment on the second cause of action in the cross-complaint that an effective policy of insurance was issued to David McCullough, and that as it was never properly cancelled, it still remained in full force and effect at the time of the accident. The findings with respect to these issues are that Hartford issued a liability insurance policy numbered 57GF269086 to David McCullough, covering a 1954 Plymouth automobile owned by him, and that in accordance with legal requirements, the policy contained a provision covering injuries resulting from a collision between the car and an uninsured motorist; that a copy of the policy was forwarded to him, although the original of the policy was retained by the local agent of Hartford, one Gene Fuerbringer; that said policy was effective as of September 6, 1961; that David McCullough "failed to pay the amount agreed upon between David McCullough and the agent of Hartford Accident and Indemnity Company"; that the agent for the company and McCullough ". . . agreed that said policy should be cancelled upon a failure to pay the premium"; that "the agent for Hartford Accident and Indemnity Company did not inform David McCullough in writing of the California Assigned Risk Plan and advising the insured of his possible rights to obtain insurance coverage under the policy and a brief description of the manner in which he might avail himself of the plan"; that, consequently, the policy was never effectively cancelled; that Danny Lee Burns ". . . was not covered by insurance at the time of the collision"; and that "Louise Lee and Jerry Lee, Jr. were passengers in the car of David McCullough."

As conclusions of law, the court determined that the policy ". . . issued to David McCullough was in full force and effect upon the date of loss, January 28, 1962"; that the attempted cancellation of the policy ". . . did not comply with Sections 651 and 652 of the California Insurance Code"; that Danny Lee Burns was an uninsured motorist; that David McCullough, Louise Lee, and the Estate of Jerry Lee, Jr. were beneficiaries under the uninsured motorist provisions of the policy, and that they should have judgment in this action for their costs of suit.

In a review of the record in this case, we must first inquire whether an effective insurance policy was issued and delivered by the company to David McCullough (27 Cal.Jur.2d, Insurance, § 194, p. 682), and, secondly, if such a policy was ever in force, whether it was legally cancelled prior to the accident?

■ This court must follow the universal appellate rule that if the evidence at the trial was in conflict on any point we cannot disturb the apposite findings of fact, if they are supported by substantial evidence. ■ In the process of examining the record, we must consider the evidence in the light most favorable to the prevailing parties, giving them the benefit, not only of conflicting evidence, but of every reasonable inference which may be drawn from the testimony to support the judgment. (*Crawford* v. *Southern Pacific Co.*, 3 Cal.2d 427 [45 P.2d 183].)

Was there an effective contract of insurance in favor of David McCullough? To answer this we must ascertain whether a policy was issued and delivered. ■ The trial court found that Hartford issued a liability insurance policy to David McCullough on his 1954 Plymouth automobile. This finding, apart from the question of delivery, is supported by substantial evidence. Mr. Fuerbringer, a local agent for the Hartford company, testified that a policy was issued by the company, and Mr. Zahner, who was charged with the processing of claims against the company, said that the company's records showed the date of the issuance of the policy.

■ But the word "issuance" as applied to insurance policies has more than one meaning. In *Brix* v. *Peoples Mut. Life Ins. Co.*, 124 Cal.App. 65, 66 [12 P.2d 108], it is said: " 'The words "issue", "issuance", and "issued", in reference to an insurance policy, are used in different senses, sometimes as meaning the preparation and signing of the instrument by the officers of the company, as distinguished from its delivery to insured, and sometimes as meaning its delivery and acceptance . . .' (32 C. J., p. 1123, sec. 225.) That the words 'issued' and 'issuance' are used in the application in the former rather than the latter sense seems clear from the provision of section 21 'that there shall be no insurance in force until the policy is *issued* and *accepted*'. (Italics ours.) Construing the words 'issued' and 'issuance' as referring to the signing of the policy by appellant's officers avoids the tautology that would otherwise exist in this provision, using as it does the words 'issued' and 'accepted' in the conjunctive.''

While the court found that Hartford issued a policy to Mr. McCullough, we note that it did not specifically find that the policy was ever delivered.

 Originally, Mr. McCullough hoped that the Finance & Thrift Company, which was financing the purchase of the car, would willingly pay the premium on the insurance policy here in question, and Mr. Fuerbringer, following the request of Mr. McCullough, attempted to have the finance company pay the premium. However, the finance company refused to do so, and it became necessary for McCullough himself to pay, if the policy was to spring into life. This he admitted he could not do, although when Mr. Fuerbringer sent him a copy of the proposed policy, he gave him 15 days within which to make the initial payment; he told him if it were not so paid the insurance policy would not be delivered, and, therefore, would be ineffective. Mr. McCullough not only advised Mr. Fuerbringer that he could not pay the premium, but he joined in the viewpoint that he did not have a policy of insurance.

Mr. Fuerbringer testified as follows:

"Q. And do you recall the circumstances of his asking you to go to Finance & Thrift to see if they would pay for an insurance policy? A. Yes.

"Q. Can you tell us what happened there, what did he ask you to do, and what did you do? A. He came in soliciting, asking for liability insurance. He said he had, I can't say, as far as material damage, which is collision insurance on the car, he wanted liability insurance and the car was financed with Finance & Thrift and they had paid the premium on the other policy and he thought maybe they would pay the premium on this policy. And would I submit it to them for payment.

"Q. Did you do that? A. I did.

"Q. What did they say? A. No, they would not, they had no insurance, this liability insurance.

"Q. Did you then tell this to Mr. McCullough? A. Yes.

"Q. Did you tell him about payment of the premium? A. I said he would have to pay the premium or he wouldn't have insurance because I just couldn't give it to him.

"Q. That is the exhibit you have before you, the one to which Mr. McCullough testified, Exhibit No. 2, do you recall sending this document to him? A. Personally recall it? I

am sure it must have come from my office, has my signature on it.

"Q. What was the circumstances of sending that to Mr. McCullough? A. I had previously corresponded in the underwriting of this policy to obtain information in order to get the policy, such as past driving history and things of that nature.

"[A] When the policy was finally okehed and put on the books, ready for delivery, this copy, not the original policy was mailed to him along with a note, the note I think he refers to probably was my invoice. It was a narrow strip asking for the premium and that it would have to be paid within fifteen days or there would be no insurance.

"Q. Then did he come in after that? A. He came in and told me he just didn't have the money and I said well I'd just have to void the policy.

"Q. Was there any other discussion about the policy at that time? A. Not to my knowledge.

"Q. Did he ever pay a premium at any time? A. Never paid a premium.

"Q. Then did you void the policy? A. The policy was voided.

"Q. And the original policy was never then delivered? A. The original policy never left my office."

On cross-examination, the agent for Hartford testified as follows:

"Q. Do you recall what time you sent Mr. McCullough the copy of the policy and the fifteen-day notice? A. I do not, exactly, I presume the latter part of September.

"Q. But the policy was in effect on December 4th, 1961, at the time you requested Hartford to cancel this policy? A. Under my interpretation, the policy was not in effect until he paid me a premium.

"Q. You had requested Hartford cancel the policy? A. I requested, that's a matter of terminology, to void the policy, the same had never been delivered. This is between the company and the agent. Since he never paid the premium, he never received the policy.

"Q. Where is the original policy at this time? A. I have no idea, it was sent to the office of Hartford Insurance.

"Q. Did you pay Hartford any sums on account of this policy? A. No, sir, I did not."

Mr. McCullough testified:

"Q. You made an application to the company and made arrangements for him to go to the finance company and he said he'd try to do that? A. He said he'd do that.

"Q. He said he couldn't, they wouldn't pay the premium? A. He didn't do that at that time.

"Q. He went over and tried to do that for you and he said it couldn't be done? A. He said they wouldn't take it.

"Q. And then at that time he told you that you'd have to pay the premium to get the policy? A. No. He sent me a policy [i.e., the copy of the policy hereafter referred to] and sent me a slip giving me fifteen days to pay it.

"Q. He sent you this exhibit here which is identified as plaintiff's Exhibit 2, this exhibit with your name on it and that name, Gene Fuerbringer, on there? A. Yes.

"Q. He sent you this with a note so you would pay the premium within fifteen days to get the policy? A. Yes, that's right.

"Q. You didn't bring the money in in fifteen days? A. No, I couldn't get it.

"Q. Wasn't this in October of 1961? A. I couldn't say.

"Q. Would you say that was pretty close? I am not going to hold you to any date, it was along in there somewhere? A. It could have been.

"Q. Didn't you go in and talk to Mr. Fuerbringer and didn't you say, 'I can't pay the premium,' and then he said, 'You have no insurance and no policy.' And you said, 'Okeh,' and left. Didn't he say, 'There isn't anything I could do'? That you didn't have any? A. He never said I didn't have no policy, he told me I'd just have to cancel it.

"⸱ ⸱ ⸱ ⸱ ⸱ ⸱ ⸱ ⸱ ⸱ ⸱ ⸱ ⸱ ⸱

"Q. You said, 'I can't pay' and then he said, 'The policy is cancelled,' whatever he said? A. That's right.

"Q. You agreed on that at that point? A. Sure I agreed.

"Q. You didn't tell him you were going to get the money some place? A. I don't have no place to get the money, just had to cancel it.

"Q. I am just trying to get at the particulars. You didn't think you had any insurance at the time you left the office with Hartford? A. No, not with Fuerbringer, but I thought I had one with the finance company.

"Q. In other words, the insurance they carried? Mr. Fuer-

bringer at no time told you you were insured with Hartford? Mr. Fuerbringer didn't tell you you were insured with Hartford. A. No, he did not.

"Q. My other question is, since that time, Mr. McCullough, since that time you didn't pay any premiums on this policy? A. No, I didn't pay any premium."

The copy of the policy sent to Mr. McCullough showed on its face that it was mailed to him for information only and that it did not have any independent validity. The following statement is contained on the copy (defendant's exhibit B): "This copy is issued as a matter of information only and confers no rights on the holder. . . .

"The issuance of this copy does not alter, change, modify or extend the terms, conditions and provisions of said policy and by issuing this copy the company does not waive any of its rights or any of the terms, conditions and provisions of said policy."

The record contains undisputed evidence, therefore, that no delivery of the policy of insurance was ever made. ▮ In 1 Appleman, Insurance Law and Practice, section 131, page 195, it is said: "It is usually held that when application is made for a policy of insurance, and the application is acted upon and the contract issued, the act of delivery completes the transaction so as to place into force and effect a binding contract. Thus delivery is considered to be a necessary condition precedent to the validity of the contract, . . ."

▮ The same author in section 132, pages 196-197, says: "The question as to whether or not a valid delivery has been effected depends chiefly upon the intention of the parties." (Citing *Paez* v. *Mutual Indemnity Acc., Health & Life Ins. Co. of California*, 116 Cal.App. 654 [3 P.2d 69], and §§ 1059 and 1627 of the Civ. Code.)

▮ It is true that when there is an unconditional delivery of a policy to the insured, or the delivery to an agent of the insurer with unconditional directions to transmit it to the insured, the company may be bound. (*Hill* v. *Industrial Acc. Com.*, 10 Cal.App.2d 178, 184-185 [51 P.2d 1126]; *Tarleton* v. *DeVeuve*, 113 F.2d 290 [132 A.L.R. 343]; *Bloom* v. *Pacific Mut. Life Ins. Co.*, 85 Cal.App. 419 [259 P. 496]; *Courdway* v. *Peoples Mut. Life Ins. Co.*, 118 Cal.App. 530 [5 P.2d 453]; *Shnell* v. *Globe Indemnity Co.*, 42 Cal.App.2d 704 [109 P.2d 1018]; 27 Cal.Jur.2d, Insurance, § 197, pp. 685-686.) ▮ But here there was not an unconditional delivery of the policy;

and there was always the express requirement that the premium be paid as a condition precedent to its effectiveness.

In 44 Corpus Juris Secundum, Insurance, section 265, pages 1055-1056, it is pointed out that: "Whether an insurance policy has or has not been delivered after its issuance so as to complete the contract and give it binding effect does not depend on its manual delivery to, or possession by, insured, but rather on the intention of the parties as manifested by their acts or words. The test of a sufficient delivery is whether the company or its agent intentionally parts with control or dominion of the policy and places it in the control or dominion of insured or some person acting for him with the purpose of thereby making a valid and binding contract of insurance. The controlling question is not who has the actual possession of the policy, but who has the right of possession. However, the possession of the policy by insured or the beneficiary is some evidence tending to show a delivery, unless the policy shows on its face that it is not completely executed so as to be binding. Delivery of a policy to insured merely for examination is not such a delivery as will create a binding contract." (See *Hill* v. *Industrial Acc. Com.*, *supra*, 10 Cal.App.2d 178; *Paez* v. *Mutual Indemnity Acc., Health & Life Ins. Co. of California*, *supra*, 116 Cal. App. 654.)

In 29 American Jurisprudence, Insurance, section 220, page 608, it is said: "A delivery is not effected . . . by a transmission of the policy to the agent of the insurer under instructions to turn over the policy to the insured only after compliance with certain conditions, such as that the applicant shall be in good health at the time, or that the premium shall be paid." (See *Pruitt* v. *Great Southern Life Ins. Co.*, 202 La. 527 [12 So.2d 261, 145 A.L.R. 1427]; *Ferguson* v. *Hartford Live Stock Ins. Co.* (La.App.) 39 So.2d 108; *Bowen* v. *Prudential Ins. Co.*, 178 Mich. 63 [144 N.W. 543, 51 L.R.A. N.S. 587]; *Kinney* v. *Northern Life Ins. Co.*, 200 Wash. 190 [93 P.2d 360, 123 A.L.R. 904]; 123 A.L.R. 907; *Morriss* v. *Home Ins. Co.*, 78 Misc. 303 [139 N.Y.Supp. 674]; 1 Appleman, Insurance Law and Practice, § 134, p. 203.)

In this case, it was never the intention of either the insurer or the proposed insured that the policy should actually be effective until the payment of the first premium. Not only was this made apparent by the local agent of Hartford, but it was fully understood by Mr. McCullough, and he agreed that he did not have any insurance under the policy. Not-

withstanding the soft talk of their soliciting agents, insurance companies are not charitable institutions; premiums are always of the essence.

The second question above posed would only be answerable if this court were of the opinion that the trial judge correctly held that an insurance policy was at one time in effect. As we have concluded that no insurance policy was ever effective and that, notwithstanding the issuance of such a policy, it was never delivered, and that Hartford and Mr. McCullough agreed that there was no viable policy, it is unnecessary to answer the second question.

There was, of course, a "cancellation" of the issued but nondelivered policy on the books of the company; it is understandable that if a policy is issued, but not actually delivered, it should be cancelled in the records of the company in compliance with an internal "requirement" of good bookkeeping; but a "cancellation" in such circumstances was of consequence to the insurance company only, as the proposed insured had no rights in the absence of the delivery of the policy.

The following provisions of the Insurance Code were current at the time of the "cancellation":

Section 651: "Notwithstanding any other provision of this code, no cancellation by an insurer of an auto liability insurance policy shall be effective prior to the mailing or delivery to the named insured at the address shown in the policy, of a written notice of the cancellation stating when, not less than ten (10) days after the date of such mailing or delivery, the date the cancellation shall become effective."

Section 652: "Every notice of cancellation mailed pursuant to the provisions of Section 651 shall contain a statement on a form to be prescribed by the Insurance Commissioner setting forth a brief description of the California Assigned Risk Plan (Article 4 (commencing with Section 11620), Chapter 1, Part 3, Division 2) and advising the assured of his possible right to obtain liability insurance coverage under the plan and a brief description of the manner in which he may avail himself of such plan."

Section 652 of the Insurance Code, as above quoted, became law on September 15, 1961, and continued in effect until it was amended in 1963.*

---

*At the latter date (1963), the requirement set forth in section 652 of the Insurance Code was said not to apply to cases where cancellation of a policy took place for the failure to pay a premium.

As the section did not establish a change in the contractual rights of insured parties but merely a change of remedy concerning cancellation, if the policy had in fact been delivered, the code section would have applied.

It should be noted in passing that it ordinarily would have been an idle act to notify a man in Mr. McCullough's position, who was unable to pay the ordinary premium required by the proposed insurance policy, that he could by proper procedure secure a policy under the California Assigned Risk Plan (Ins. Code, § 11620 et seq., div. 2, pt. 3, ch. 1), for it is common knowledge that the cost of insurance coverage under the assigned risk plan exceeds the cost of public liability insurance under the ordinary plan; the Legislature of California recognized this contradiction at its 1963 session by amending the statute as stated in the foregoing footnote.

In any event, the record shows without conflict that there never was a delivery of the insurance policy in question, and consequently the trial court was in error in finding that there was an effective policy.

The judgment as appealed from is reversed.

Brown (R. M.), J., and Stone, J., concurred.

Respondents' petition for a hearing by the Supreme Court was denied August 18, 1965.