[No. B067000. Second Dist., Div. Seven. Dec. 9, 1993.]

GOLDEN EAGLE INSURANCE COMPANY, Plaintiff and Appellant, v. FOREMOST INSURANCE COMPANY, Defendant, Cross-defendant and Respondent;
ANTON BERKOVICH et al., Defendants, Cross-complainants and Appellants.

## COUNSEL

Bolton, Dunn & Yates, James T. Hudson and Kathryn A. Ruston for Plaintiff and Appellant.

Pillsbury, Madison & Sutro, Michael H. Salinsky and Jeffrey A. Rich for Defendants, Cross-complainants and Appellants.

Lewis, D'Amato, Brisbois & Bisgaard and Raul L. Martinez for Defendant, Cross-defendant and Respondent.

## OPINION

**JOHNSON, J.**—Following settlement of a lawsuit against its insureds, Anton and Cynthia Berkovich, Golden Eagle Insurance Company initiated this action against the Berkoviches and Foremost Insurance Company for equitable contribution and subrogation. The Berkoviches filed a cross-complaint seeking reimbursement from Foremost for the amount they contributed to the settlement of the underlying suit and reimbursement for attorney fees from Foremost and Golden Eagle. The matter was tried to the court, which entered a judgment denying the claims of all parties. For the reasons explained below, we affirm in part and reverse in part.

### FACTS AND PROCEEDINGS BELOW

#### A. *The Underlying Litigation*

In July 1986 the Berkoviches purchased a mobilehome park from the Williamsons. In February 1989 the Berkoviches and the Williamsons were sued by 160 tenants seeking damages arising out of alleged improper maintenance of the facilities and grounds at the park. The complaint alleged the defendants' neglect occurred continuously during the previous four years and was continuing.

The Williamsons tendered defense of the action to Foremost and the Berkoviches tendered defense to Foremost and Golden Eagle. Foremost and Golden Eagle accepted the Berkoviches' defense without reservation of rights.

Subsequently, without the Berkoviches' consent, Golden Eagle negotiated a settlement with the tenants for the sum of $4,250,000. Under the terms of the settlement Golden Eagle contributed $3 million; Foremost contributed $1

million; the Berkoviches were required to contribute $250,000. The settlement agreement preserved Golden Eagle's rights to dispute coverage for the period March 4, 1989, to March 4, 1990, and to seek contribution and subrogation from Foremost and the Berkoviches. Over the Berkoviches' objections, the trial court approved the settlement as a good faith settlement under Code of Civil Procedure section 877.6.

B. *The Foremost Policies*

The facts relating to the Foremost policies are discussed more fully below. Briefly, at the time the Williamsons sold the mobilehome park to the Berkoviches the Williamsons had an insurance policy with Foremost covering claims of the park tenants for loss due to bodily injury, property damage and certain other occurrences. This policy was endorsed over to the Berkoviches effective June 30, 1986. The limit of liability under this policy was $1 million. This policy expired October 1, 1986.

On October 17, 1986, Foremost's agent, the Brian Holmes Insurance Agency, sent the Berkoviches a "Certificate of Insurance" showing renewal of the policy for the period October 1, 1986, to October 1, 1987. The certificate of insurance was accompanied by a bill for a premium deposit. The Berkoviches never paid any part of this bill and, in December 1986, Foremost issued a notice of cancellation based on "nonpayment of premium."

C. *The Golden Eagle Policies*

Following cancellation of the Foremost policy, the Berkoviches obtained similar coverage with the same $1 million policy limit from Golden Eagle. The first Golden Eagle policy was effective from March 4, 1987, to March 4, 1988. The policy was renewed on an annual basis on March 4, 1988, and March 4, 1989. The March 4, 1989, renewal occurred after the Berkoviches were served with the complaint in the park tenants' suit.

D. *The Berkoviches' Cross-complaint Against Foremost and Golden Eagle*

The Berkoviches' coverage claim against Foremost is based on the same facts relating to the Foremost policies briefly discussed above and discussed more fully, *post*. Essentially, the Berkoviches contend the endorsement on the Williamsons' policy created, in effect, a new policy with a $1 million limit separate and apart from the $1 million limit applicable to the Williamsons. They further contend the renewal policy was in full force and

effect from October 1, 1986, until it was cancelled effective December 29, 1986. Thus, Foremost's exposure under its policies is $3 million rather than the $1 million it contributed to the settlement.

The Berkoviches also contend the settlement proposed by Golden Eagle and Foremost created a conflict of interest between the insurers and the Berkoviches entitling the Berkoviches to retain independent counsel at the insurers' expense. The conflict of interest arose from the insurers' seeking court approval of a proposed settlement which would exhaust their policy limits, require contribution from the Berkoviches and leave the Berkoviches without coverage for claims which might later be made by tenants who did not join in the underlying lawsuit.

### E. *Proceedings Below*

Trial of the action was based primarily on stipulated facts and exhibits. The court found in favor of the defendants on Golden Eagle's complaint for equitable contribution and subrogation and in favor of the cross-defendants on the Berkoviches' cross-complaint for indemnification and attorney fees. Golden Eagle filed a request for a statement of decision and a proposed statement of decision. The court adopted its tentative ruling as its statement of decision and entered judgment accordingly. Golden Eagle and the Berkoviches filed timely appeals.

### DISCUSSION

### I. *Golden Eagle Waived Any Defects in the Statement of Decision by Failing to Object in the Trial Court.*

Golden Eagle filed a timely request for a statement of decision under Code of Civil Procedure section 632 outlining 36 issues it claimed were in controversy. On February 10, 1992, it served its proposed 42-paragraph statement of decision on the other parties. The record does not reflect whether or when this proposed statement of decision was filed with the trial court. In any event, on February 11, 1992, the trial court adopted its tentative decision as its statement of decision.

On appeal, Golden Eagle contends the court's statement of decision failed to resolve many of the controverted issues in the case and, therefore, we should remand the matter for a trial de novo on the omitted issues or, alternatively, we should not infer the trial court decided those issues in favor of Foremost and the Berkoviches. (Code Civ. Proc., § 634.)

Based on our review of the record, we believe the statement of decision adequately covered the principal controverted issues at trial. ■ The trial

court is not required to respond point by point to the issues posed in a request for statement of decision. The court's statement of decision is sufficient if it fairly discloses the court's determination as to the ultimate facts and material issues in the case. (*People* v. *Casa Blanca Convalescent Homes, Inc.* (1984) 159 Cal.App.3d 509, 525 [206 Cal.Rptr. 164, 53 A.L.R.4th 661]; *Republic Indemnity Co.* v. *Empire Builders Corp.* (1985) 167 Cal.App.3d 1163, 1167 [213 Cal.Rptr. 787].)

■ Furthermore, Golden Eagle waived any defects in the statement of decision by failing to file timely objections. Golden Eagle contends its proposed statement of decision served to bring the alleged defects in the trial court's statement of decision to the court's attention. We disagree.

Under Code of Civil Procedure section 634, a party claiming deficiencies in the trial court's statement of decision must bring those deficiencies "to the attention of the trial court . . . ." While it is true this section "does not specify the particular means that the party may use to direct the court's attention to the claimed defects in the statement," (*In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1134 [275 Cal.Rptr. 797, 800 P.2d 1227]), rule 232(d) of the California Rules of Court provides: "Any party affected by the judgment may, within 15 days after the proposed statement of decision and judgment have been served, serve and file objections to the proposed statement of decision or judgment."

Code of Civil Procedure section 634 and California Rules of Court, rule 232, taken together, clearly contemplate any defects in the trial court's statement of decision must be brought to the court's attention through specific objections to the statement itself, not through a proposed alternative statement of decision served prior to the court's issuance of its own statement. By filing specific objections to the court's statement of decision a party pinpoints alleged deficiencies in the statement and allows the court to focus on the facts or issues the party contends were not resolved or whose resolution is ambiguous. A proposed alternative statement of decision, such as the one filed by Golden Eagle, does not serve these functions and does not satisfy the requirements of Code of Civil Procedure section 634 and California Rules of Court, rule 232.

II. *Transfer of the Foremost Policy From the Williamsons to the Berkoviches Did Not Increase the Policy Limit by an Additional $1 Million.*

■ Golden Eagle and the Berkoviches assert the transfer of coverage under the existing Foremost policy from the Williamsons to the Berkoviches

created a separate $1 million liability limit under the policy in favor of the Berkoviches. As the trial court correctly found, there is no basis in fact or law for this contention.

At the time the Berkoviches purchased the mobilehome park from the Williamsons there was an insurance policy issued by Foremost covering the Williamsons for liability arising out of bodily injury or property damage suffered by tenants of the park. (We will refer to this policy at times as the original policy.) The limit of liability under this policy was $1 million. As part of the purchase price of the park, the Berkoviches paid the Williamsons the pro rata portion of the premium for the remaining three months of coverage under this policy. The Berkoviches did not pay any additional premium for coverage under the original policy.

Shortly after purchasing the park, the Berkoviches received a copy of an endorsement to the policy stating that as of June 30, 1986, "[t]he named insured is hreby [sic] changed to read: Anton Berkovich & Cynthia Berkovich . . . [a]ll other insureds and additional insureds are deleted." This endorsement was followed two months later by an endorsement stating that effective June 30, 1986, the Berkoviches were added to the policy as "additional insured[s]" and "[a]ll others are deleted."

Golden Eagle and the Berkoviches make much of the fact the first endorsement to the policy substituted the Berkoviches as the "named insured." Golden Eagle analogizes this endorsement to an assignment which, it claims, "operated to discharge the rights and obligations incident to the original parties [the Williamsons.]" Thus, according to Golden Eagle, "[a]s the sole named insureds the Berkoviches were the only insureds entitled to the $1,000,000 limit of the policy."

Golden Eagle does not explain how substituting the Berkoviches for the Williamsons as the "named insured" makes two policies out of one. Indeed its argument is self-defeating because if, as it argues, "the Berkoviches were the only insureds entitled to the $1,000,000 limit of the policy" then Foremost's exposure under the policy was still only $1 million, not $2 million.

In our view it is irrelevant whether the Berkoviches were covered under the policy as the "named insured" or as "additional insureds." The policy expressly provides: "*Regardless of the number of . . . insureds under this policy*, . . . the total liability of the company is for all damages because of all bodily injury and property damage which occurs during each annual period while this policy is in force commencing from its effective date, shall not exceed the limit of liability stated in the Schedule of this endorsement as 'aggregate.'" (Italics added.)

The "aggregate" stated in the schedule was $1 million.

In light of this unambiguous language, it would be error to hold that every time during the policy period the named insured changed Foremost's liability increased by $1 million. Suppose the named insured changed six times during the policy period. Under Golden Eagle's argument the sixth named insured would have $6 million in coverage having paid only one-sixth of the premium for a $1 million policy. We decline to adopt such an absurd result.

III. *The Berkoviches Were Covered Under Foremost's Renewal Policy From October 1, 1986, Through December 29, 1986.*

The Berkoviches and Golden Eagle contend the Berkoviches were covered by a renewal of the original policy from October 1, 1986, until the policy was cancelled by Foremost in December 1986. (We will refer to this policy at times as the renewal policy.) Foremost contends this renewal policy was never in effect and the Berkoviches' coverage ceased with the expiration of the original policy on October 1, 1986. The trial court found in favor of Foremost on this issue. We reverse.

As noted above, the original policy expired on October 1, 1986. On October 17, 1986, the Holmes agency sent the Berkoviches a letter, a certificate of insurance and an invoice for a premium deposit in the sum of $4,637. The letter stated, in relevant part, "Enclosed is the Insurance Certificate providing continuous insurance coverage . . . . [¶] Our invoice for the deposit premium required . . . is enclosed. Payment at this time will afford you uninterrupted insurance protection." The certificate of insurance contained the following relevant statements: "This certificate is issued as a matter of information only and confers no rights upon the certificate holder. This certificate does not amend, extend, or alter the coverage afforded by the policies below. [¶] This is to certify that policies of insurance listed below have been issued to the insured named above for the policy period indicated." The certificate referred to the renewal of the original policy effective October 1, 1986, and expiring October 1, 1987, in the sum of $1 million. The named insureds on the certificate were the Berkoviches. The premium invoice stated the. "amount due" was $4,627. It did not state a date for payment. The policy itself was issued by Foremost in November 1986 and received by the Holmes agency on December 8, 1986. The policy was never physically delivered to the Berkoviches. It is undisputed the Holmes agency was an agent of Foremost.

Mr. Berkovich testified he received and read the letter, certificate and premium invoice and he understood from reading them Foremost was renewing the policy on the mobilehome park. Asked what he understood about

payment of the premium, Mr. Berkovich testified, "Well, I understand if I don't pay insurance premium, then I won't have insurance for one year. See, that's why I shop around for better rate." Mr. Berkovich also testified he told the Holmes agency in a telephone conversation he thought the 400 percent increase in the premium was "ridiculous" and "I gonna look someplace else."

Nancy Terpstra, Holmes's office manager, testified she had a telephone conversation with Mr. Berkovich on December 9, 1986, regarding payment of the premium on the renewal policy. Mr. Berkovich told her "the premiums were not affordable and that he was not going to pay it [sic] at that time." He also told her, "[H]e was shopping for other coverage and he just could not afford the price of the Foremost policy and he had no intent of paying the high price, that he felt he could obtain coverage at a lower premium." As a result of this telephone conversation, Ms. Terpstra testified, she called Foremost "and indicated . . . the premium was not going to be paid and I needed to have it [i.e., the renewal policy] canceled immediately or notice of cancellation sent immediately." She also testified she asked Foremost to cancel the policy because, in her opinion, the policy was in force. She also conceded "there is no definite time set that [Mr. Berkovich] had to pay [the premium]."

Foremost sent a notice of cancellation to the Berkoviches on December 16, 1986. The notice stated the renewal policy was being cancelled for "Nonpayment of premium" and the cancellation would take effect on December 29, 1986.

In January 1987 the Holmes agency sent the Berkoviches a bill for the premium accrued on the renewal policy prior to its cancellation date. Ms. Terpstra testified this bill represented her estimate of "the earned premium for the time that the policy was in force . . . and I was sending [Mr. Berkovich] the invoice in order to collect some premium to cover the policy that was in force." In February 1987 Ms. Terpstra had a telephone conversation with Mr. Berkovich about this bill. As she recalled the conversation, "Mr. Berkovich felt there was absolutely no way he was going to pay the premium that was invoiced to him. He did not want the policy; he was not going to pay for it. . . . He was not going to pay the $5,500 that I had invoiced him for the extension of the policy, the earned premium."

Under the arrangement between the Holmes agency and Foremost, a "commercial package" policy such as the one at issue here was issued by Foremost but the billing was done by Holmes. Foremost would debit the

Holmes agency for the premium irrespective of whether the insured had paid the premium. It was up to Holmes to collect the premium from the insured. Here, the Holmes agency was debited for the full premium on the Berkoviches' renewal policy.

Following her February 1987 conversation with Mr. Berkovich, in which he stated he would not pay the premium earned on the renewal policy, Ms. Terpstra contacted the head of the underwriting department at Foremost and told him "we needed to get off of the policy flat, if he could do our agency a favor by doing that." Ms. Terpstra explained to get out of the policy "flat" meant "there would be no charge to our office, that [Foremost] would cancel the policy flat back to the original inception date without any monies being due." She also testified cancelling "flat" meant "no coverage is in force and no money is due." Foremost acceded to her request and issued a "cancellation credit memorandum" to Holmes showing a full return of the premium to Holmes.

From these facts the trial court concluded the renewal policy never took effect because the Berkoviches "expressly rejected the offered renewal policy." This finding is not supported by the evidence. Furthermore, although the circumstances surrounding the issuance of the renewal policy are somewhat peculiar, we believe the only reasonable interpretation is that the renewal policy was in effect from October 1, 1986, until cancelled pro rata on December 29, 1986.

■ Foremost is clearly correct in stating an insurance policy is a contract and, like all contracts, requires mutuality of assent. (*Argonaut Ins. Co.* v. *Industrial Acc. Com.* (1961) 190 Cal.App.2d 392, 397 [12 Cal.Rptr. 71].) "To effect the renewal of an insurance policy there must be both an offer to renew and an acceptance of the offer." (*Fujimoto* v. *Western Pioneer Ins. Co.* (1978) 86 Cal.App.3d 305, 313 [150 Cal.Rptr. 88].) ■ Foremost argues the renewal policy it issued constituted an offer to renew but there was no acceptance of the offer by the Berkoviches. Thus, under basic contract law a policy for the period in question never came into being. In our view, the facts of this case do not permit such a simplistic resolution of the matter.

The evidence shows Mr. Berkovich understood from reading the Holmes letter, the certificate of insurance and the invoice Foremost was renewing the original policy. Mr. Berkovich, however, wanted to "shop around" for a better rate. According to Ms. Terpstra, Holmes's office manager, Mr. Berkovich told her on December 9, 1986, the premium for the Foremost policy was too high "and that he was not going to pay it *at that time*." (Italics added.)

The fact Mr. Berkovich failed to pay the premium deposit and wanted to shop around for a better rate did not constitute an express rejection of the Foremost policy. No due date was stated for the premium deposit. The fact Mr. Berkovich wanted to shop around for a better rate shows only that he was a prudent consumer.

Even more significant is the fact neither Holmes nor Foremost treated Mr. Berkoviches' failure to pay the premium deposit or his shopping for other coverage as a rejection of the renewal policy. Ms. Terpstra's response was to call Foremost and ask it to *cancel* the policy. Foremost then issued a prospective cancellation notice on December 16, 1986, effective December 29, 1986. The following month Holmes billed the Berkoviches for *"the earned premium for the time that the policy was in force."* If there had been no contract of insurance between Foremost and the Berkoviches there would have been no necessity for a cancellation. Furthermore, "[t]he fact that it was a pro rata cancellation is revealing evidence that the insurance company at the time treated this policy as an existing valid contract of insurance." (*Negvesky* v. *Alston* (1957) 152 Cal.App.2d 66, 69 [312 P.2d 728].)[1]

Foremost contends even if the Berkoviches did not expressly reject the policy neither did they expressly accept it by paying the premium. Foremost cannot contest coverage on this ground because it did not require payment of the premium by the insured as a condition of coverage. Under the arrangement between Foremost and Holmes, Foremost issued the policy, collected the premium from Holmes and left it to Holmes to collect from the insured. Foremost did not require the payment of the premium to manifest acceptance of a renewal policy. Indeed, unless Holmes requested cancellation of a policy for nonpayment, Foremost would never know whether its insured had paid the premium or not.

Acceptance of an offer to renew an insurance policy may be found from the circumstances. Furthermore, under certain circumstances the insurer may be estopped from asserting the policy was not renewed. We conclude the evidence in this case supports a finding the Berkoviches accepted Foremost's offer to renew the original policy and a finding Foremost is estopped from denying the renewal policy was in effect.[2]

As a general rule, silence or inaction does not constitute acceptance of an offer. (1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts,

---

[1] As the court in *Negvesky* explained, "With a pro rata cancellation the insurance company demands payment by the insured of the pro rata portion of the premium for the time during which the policy was in force and effect." (152 Cal.App.2d at p. 69.)

[2] Where, as here, a jury trial was waived we have authority to make factual determinations contrary to those made by the trial court. (Code Civ. Proc., § 909.) It is appropriate to exercise that authority here because the necessary factual determinations can be based on the

§ 198.) There are several well-recognized exceptions to this rule. Acceptance of an offer may be inferred from inaction in the face of a duty to act (*Durgin* v. *Kaplan* (1968) 68 Cal.2d 81, 91 [65 Cal.Rptr. 158, 436 P.2d 70]; Rest.2d Contracts, § 69, subd. (1)(c)); and from retention of the benefit offered (Civ. Code, § 1589; *Durgin* v. *Kaplan, supra*; *McAulay* v. *Jones* (1952) 110 Cal.App.2d 302, 308 [242 P.2d 650]; Rest.2d Contracts, *supra*, § 69, subd. (1)(a).) ▄▄▄ Thus, as courts in other jurisdictions have found, silence coupled with retention of a renewal policy or renewal certificate may constitute sufficient evidence of an acceptance so as to place the renewal in full force and effect. (*Harrington* v. *Aetna Casualty and Surety Company* (Tex.Civ.App. 1973) 489 S.W.2d 171, 176; *Cook* v. *Michigan Mutual Liability Company* (1972) 154 Ind.App. 346 [289 N.E.2d 754, 757]; and see 13A Appleman, Insurance Law and Practice (1976) § 7641 and cases cited therein.)

In the present case it is undisputed the Berkoviches received a written notification from Foremost's agent, Holmes, informing them they were being "provid[ed] continuous insurance coverage." A bill for a deposit toward the premium for the renewal policy was enclosed. Mr. Berkovich understood from these documents the policy had been renewed and he was being billed for the new period of coverage. He retained the renewal certificate for nearly two months before objecting the premium was too high. He did not purchase other insurance during this period.

These facts show the Berkoviches received and enjoyed the benefits of insurance they knew was being offered to them for a price. When the Berkoviches received Holmes's notice of renewal, they could have rejected the renewal policy without any material inconvenience or expense. Instead they retained the certificate of renewal and made no objection to the amount of the premium until nearly two months later.

We also note Foremost's offer did not come from "out of the blue." There was an existing relationship between Foremost and the Berkoviches. The Berkoviches knew the mobilehome park was insured by Foremost. They had paid their pro rata share of the Foremost premium to the Williamsons when they purchased the park. In addition they received notice from Foremost they had been substituted as the named insureds on the original policy.

The conduct on the part of the Berkoviches in retaining the certificate together with the existing relationship between the Berkoviches and Foremost is sufficient evidence of acceptance of the renewal policy under the

---

uncontradicted evidence adduced at trial and the matter can thereby be disposed of by a single appeal and without further proceedings in the trial court. (*Ibid.*)

rule "[a] voluntary acceptance of the benefit of a transaction is equivalent to a consent to all obligations arising from it, so far as the facts are known, or ought to be known, to the person accepting." (Civ. Code, § 1589.)

 Furthermore, where the offeror has given the offeree reason to believe acceptance may be manifested by inaction, the offeror cannot later reverse its position and argue the offeree's inaction did not constitute acceptance. Section 69, subdivision (1)(b) of the Restatement Second of Contracts states an offeree's silence or inaction operates as an acceptance "[w]here the offeror has stated or given the offeree reason to understand that assent may be manifested by silence or inaction, and the offeree in remaining silent and inactive intends to accept the offer."

·(5c) The notice to the Berkoviches told them they had been "provid[ed] continuous insurance coverage" and "the policies of insurance listed below have been issued . . . for the policy period indicated." The period indicated was for one year commencing October 1, 1986. This notice was accompanied by a bill for a deposit toward the premium. A reasonable person would conclude, as Mr. Berkovich did, Foremost had renewed the policy without the necessity of any positive act on his part; however, if he wanted the policy to remain in force he would have to pay the premium at some future time. Mr. Berkovich was entitled to rely on Foremost's implied representation inaction would constitute acceptance. Mr. Berkovich did indeed rely on this representation as evidenced by the fact he did not immediately purchase a replacement policy but instead engaged in comparison shopping to see if he could obtain a better rate.

 As a separate, independent ground for our holding the renewal policy was in effect, we find Foremost is estopped by its business practices from asserting the contrary.

The evidence in this case shows Foremost followed a practice of issuing renewal policies automatically and debiting the accounts of its agents for the amount of the premiums due. It was up to the agents to collect the premiums from the insured. This practice had two business advantages to Foremost. By renewing policies automatically, Foremost could expect most of its insureds would simply acquiesce in continued coverage by Foremost rather than take the time and trouble to shop for better terms or a lower premium. Foremost incurred no risk from this practice because it received payment for the premiums on the renewal policies from the agents. The agents, not Foremost, bore the risk of loss.

The practice followed by Foremost is by no means new to the insurance industry. More than 100 years ago the United States Supreme Court observed, "[T]he rule is well settled where a credit is intended that the policy

is valid though the premium was not paid at the time the policy was delivered, *as where credit is given by the general agent and the amount is charged to him by the company* the transaction is equivalent to payment." (*Miller* v. *Life Insurance Company* (1870) 79 U.S. (12 Wall.) 285, 303 [20 L.Ed. 398, 402], fn. omitted, italics added.) This rule is recognized today in California and other jurisdictions. (*Negvesky* v. *Alston, supra,* 152 Cal.App.2d at p. 70; and see *Markel* v. *Travelers Insurance Co.* (10th Cir. 1975) 510 F.2d 1202, 1206-1207 and cases cited therein.)

The rationale for holding the insurer liable under the policy in these situations rests on the principle of equity: "He who takes the benefit must bear the burden." (Civ. Code, § 3521.) Where the insurer issues a policy and collects a premium, whether from its agent or directly from the insured, fundamental fairness requires the insurer be bound by the policy.[3]

Foremost contends its renewal policy did not take effect because, unlike *Miller* and *Negvesky*, the policy was never delivered to the purported insureds. The evidence shows Foremost sent the renewal policy to the Holmes agency but Holmes never forwarded it to the Berkoviches. It is not necessary, however, for an insurance policy to be physically delivered to the insured in order for the policy to be effective. (*Hartford Acc. & Indem. Co.* v. *McCullough* (1965) 235 Cal.App.2d 195, 204 [44 Cal.Rptr. 915]. "[W]here the insurer mails the policy to its agent, the intent with which this act is performed governs in determining the sufficiency of delivery." (1 Appleman, Insurance Law and Practice, *supra,* § 132, pp. 441-442.) In the present case, the evidence shows Foremost renewed the existing policy on the mobile-home park unconditionally with the intent to retain the Berkoviches as customers and to look to Holmes for payment of the premium.

■ Foremost next argues even if the renewal policy initially took effect, it was cancelled retroactive to its date of inception, October 1, 1986. Foremost's argument rests on the fact in February 1987 it cancelled the policy "flat" as of October 1, 1986, and refunded the full amount of the premium to Holmes. As the testimony in this case shows, the term "cancel flat" as used in the insurance industry means to cancel the policy from its inception date without liability on the part of the insured for premiums or liability on the part of the insurer for losses. (See also *Spott Electrical Co.* v. *Industrial Indem. Co.* (1973) 30 Cal.App.3d 797, 804 [106 Cal.Rptr. 710].)

---

[3]The fact Foremost voluntarily returned the premium to Holmes as a "favor" after the policy was cancelled does not alter the fact Foremost earned and was paid a premium covering the period the policy was in effect. We believe, however, equity requires the earned portion of the premium be set off against the amount Foremost is required to contribute to the settlement. (See, *post,* pp. 1389-1390.)

When an insured obtains binder coverage from several insurers while negotiating for the best deal, the insured may cancel "flat" the binders from the unsuccessful bidders. (*Spott Electrical Co., supra*, 30 Cal.App.3d at p. 808) An insurer may cancel "flat" in order to void a policy issued in error. (*Argonaut Ins. Co.* v. *Industrial Acc. Com., supra*, 190 Cal.App.2d at p. 396) However, in this case, Foremost is treating its canceling "flat" as a rescission of its contract with the Berkoviches. This it cannot do. Foremost presented no evidence of material misrepresentations, concealment of material facts or any other basis for rescinding its contract with the Berkoviches. (See Ins. Code, §§ 331, 359; *Imperial Casualty Co.* v. *Sogomonian* (1988) 198 Cal.App.3d 169, 182 [243 Cal.Rptr. 639].) Absent grounds for rescission, there is nothing the insurer can unilaterally do to avoid liability under the policy once the contingency insured against occurs. (*Harman* v. *American Casualty Co. of Reading, Pa.* (S.D.Cal. 1957) 155 F.Supp. 612, 614; 6A Appleman, *supra*, Insurance Law and Practice § 4181, pp. 521-522; 17 Couch on Insurance (2d ed. 1983) § 67:22, pp. 477-478.)

■ Foremost further contends damages claimed by the park tenants were not covered under the renewal policy because those damages first manifested themselves prior to the issuance of the renewal policy. (See *County Sanitation Dist.* v. *Harbor Ins. Co.* (1993) 17 Cal.App.4th 1622, 1633 [22 Cal.Rptr.2d 90].) The factual premise for this argument is incorrect.

The evidence shows the park suffered from problems with its electric, gas and water utilities as well as with settling of the land and the emission of methane gas. Each time one of these problems occurred, one or more of the tenants suffered injury. The problems occurred sporadically throughout the period covered by Foremost's original policy and the renewal policy. In addition, during the renewal policy period new tenants moved into the park. The purpose of the third party liability policies Foremost issued the Berkoviches was to defend and indemnify the Berkoviches against personal and property damage suffered by the park tenants. " '[T]he policy is invoked or "triggered," *when the time of the injury is within the effective dates of the policy*; the time of the "occurrence" producing the injury is irrelevant to the triggering of the policy.' " (*Whittaker Corp.* v. *Allianz Underwriters, Inc.* (1992) 11 Cal.App.4th 1236, 1243 [14 Cal.Rptr.2d 659], italics added.) Therefore, since the evidence shows at least some of the tenants suffered injuries during the effective dates of the renewal policy, Foremost is liable under the renewal policy.

Finally, Foremost argues equitable contribution or subrogation should be denied because the Berkoviches and Golden Eagle failed to produce any

evidence of the actual damages the tenants sustained during the period Foremost's renewal policy was in effect. Foremost cites no authority for this contention and we decline to accept it. As we have noted, the tenants' suit never went to trial; it was settled for the sum of $4,250,000 and the trial court approved this settlement as a good faith settlement under Code of Civil Procedure section 877.6. ■■■ Where two insurers cover the same risk, the costs of settlement should be shared between them pro rata in proportion to their respective coverage of the risk; otherwise, one will profit at the expense of the other. (*State Farm & Casualty Co.* v. *Cooperative of American Physicians, Inc.* (1984) 163 Cal.App.3d 199, 204-205 [209 Cal.Rptr. 251].) Furthermore, requiring Golden Eagle to prove the amount of the tenants' damages attributable to the period covered by Foremost's renewal policy would defeat a major purpose of the settlement, to *avoid* a lengthy and costly trial of a complex action involving 160 plaintiffs. (Cf. *Mullin Lumber Co.* v. *Chandler* (1986) 185 Cal.App.3d 1127, 1132 [230 Cal.Rptr. 122].)

For the reasons set forth above, we conclude the renewal policy was in effect from October 1, 1986, to December 29, 1986. Therefore, Foremost is required under principles of equity to further contribute to the settlement of the underlying action.

Foremost's contribution to the settlement should be based on its pro rata share of the total respective policy limits at risk: Foremost—$2 million; Golden Eagle—$3 million. The underlying action was settled for a total of $4,250,000 million. Thus, Foremost is liable for two-fifths of the settlement ($1.7 million) and Golden Eagle is liable for three-fifths of the settlement ($2,550,000). Since the settlement was below the total policy limits of $5 million, the Berkoviches are not liable for a contribution to the settlement. Golden Eagle contributed $3 million to the settlement; Foremost contributed $1 million and the Berkoviches contributed $250,000. Therefore, Foremost will be ordered to pay $450,000 to Golden Eagle and $244,500 to the Berkoviches. (We have deducted from the amount due the Berkoviches the amount of the premium earned by Foremost on the renewal policy.)

IV. *Golden Eagle Is Estopped From Denying Coverage to the Berkoviches Under the Policy Issued March 4, 1989.*

Golden Eagle seeks to recover the sum of $1 million from the Berkoviches. Recovery is sought on the ground the policy it issued the Berkoviches on March 4, 1989, did not cover any losses alleged in the tenants' lawsuit because those losses were apparent and known to the Berkoviches prior to

March 4, 1989 and, therefore, were not insurable.[4] It is undisputed the Berkoviches were served with the complaint in the tenants' action in February 1989. It is also undisputed Golden Eagle accepted the Berkoviches' tender of defense of the tenants' suit without any reservation of rights.

The trial court concluded the "loss in progress" rule barred coverage for the tenants' claims under the March 4, 1989, policy. However, the court also ruled Golden Eagle could not obtain reimbursement from the Berkoviches for the $1 million it paid under the March 4, 1989, policy because it accepted defense of the tenants' claims without a reservation of rights and failed to afford the Berkoviches a reasonable opportunity to assume their own defense. The latter ruling is supported by the case law and the evidence at trial. Thus, we need not decide whether the so-called "known loss" or "loss in progress" rule applies to this case.

In *Val's Painting & Drywall, Inc.* v. *Allstate Ins. Co.* (1975) 53 Cal.App.3d 576, 588 [126 Cal.Rptr. 267], the insurer settled the underlying action against its insured and then sought reimbursement from the insured on the ground its policy did not cover the claims in the underlying action. In holding the insurer's complaint failed to state a cause of action the court stated: "Absent an agreement by the insured—express or implied in fact— that the insurer may commit the insured's own fund toward any reasonable settlement, the insurer is not permitted to seek reimbursement for a particular settlement unless it has secured specific authority to make that settlement or has notified the insured of a reasonable offer by the claimant and given the insured an opportunity to assume the defense."

Here, Golden Eagle did not have the Berkoviches' authority for the settlement it made with the tenants. Furthermore, the trial court found on substantial evidence Golden Eagle did not give the Berkoviches a reasonable opportunity to assume their own defense. As noted above, Golden Eagle accepted defense of the action without any mention of a dispute as to coverage. The first reference to noncoverage under the March 4, 1989, policy was contained in a letter to the Berkoviches dated October 10, 1989, approximately two months before the scheduled trial date. Golden Eagle did not express its intent to settle without the Berkoviches' consent until the trial was already underway.

Golden Eagle relies on *Maryland Casualty Co.* v. *Imperial Contracting Co.* (1989) 212 Cal.App.3d 712, 722 [260 Cal.Rptr. 797], for the proposition the

---

[4]When a loss is "known or apparent" before the policy of insurance is issued, there is no coverage. (Ins. Code, §§ 22, 250; *Prudential-LMI Com. Ins.* v. *Superior Court* (1990) 51 Cal.3d 674, 695 [274 Cal.Rptr. 387, 798 P.2d 1230].) This rule is commonly referred to as the "known loss" or "loss in progress" rule.

"specific authorization to make [a] settlement" required by *Val's Painting*, *supra*, need not come from the insured but may be granted by the trial court where the insured refuses to consent.

In *Maryland Casualty*, the insurer undertook the defense of Imperial Contracting under a written reservation of rights expressed at the very outset of the defense. While the underlying action was pending, Maryland Casualty brought a declaratory relief action against Imperial disputing coverage of the claims. Two years after undertaking the defense of the underlying action Maryland Casualty notified Imperial "this case may be in a position to be settled" and asked Imperial for permission to settle subject to its right to seek reimbursement if it was later determined there was no coverage under the policy. Imperial refused to authorize settlement but never claimed it was not liable or that it wanted to take over the action. Under those circumstances, the trial court in the underlying action authorized the insurer to pursue settlement without the insured's permission and ultimately approved the settlement as reasonable and in good faith. Subsequently, in the declaratory relief action, the Court of Appeal held there was no coverage under the policy and Maryland Casualty was entitled to reimbursement from Imperial of the amount expended in settlement of the underlying action.

On the issue of reimbursement, the court in *Maryland Casualty* concluded the trial court's order in the underlying action "authorizing Maryland to enter into the settlement, in the context of the full notice Imperial had concerning the settlement and its terms and Imperial's express rejection of Maryland's request for authority to enter the settlement, fully comports with the concerns underlying the *Val's Painting* rule. Under these circumstances it was unnecessary to give Imperial an opportunity to assume the defense." (212 Cal.App.3d at p. 722.)

Here, the trial court in the underlying action granted Golden Eagle authority to attempt to settle with the tenants and found the resulting settlement to be reasonable and in good faith. This, according to Golden Eagle, satisfied the *Val's Painting* rule and paved the way for this suit against the Berkoviches for reimbursement of the amount paid on uncovered claims. Under these circumstances, Golden Eagle argues, it was unnecessary to give the Berkoviches an opportunity to assume the defense.

But the circumstances in the present case are not like those presented in *Maryland Casualty*. In *Maryland Casualty*, the insurer notified the insured at the time it accepted tender of the defense that it was disputing coverage. In fact, it filed an action of its own against the insured for a declaratory

judgment that there was no coverage. Two years passed between the time Maryland informed Imperial it was disputing coverage and the time Maryland requested Imperial's authority to settle. In those two years "Imperial did not tell Maryland that it was not liable or that it wanted to take over the litigation." (212 Cal.App.3d at p. 722.) Thus, in *Maryland Casualty*, the insured knew from the outset it might be responsible for paying a judgment in the underlying action. Knowing this, the insured allowed the insurer to defend the action for two years. Thus, when it appeared the case might be in a position to be settled, there was in fairness no need for the insurer to offer the defense to the insured. The insured had already had two years, knowing its assets were at risk, to assume its own defense at a time when it would have been practical to do so.

In contrast to *Maryland Casualty*, the insureds in the present case notified Golden Eagle at the outset that if any rights were to be reserved they wished to assume their own defense. The Berkoviches further told Golden Eagle if it decided no rights were to be reserved their present counsel "shall promptly substitute out of the Action in favor of the attorneys of your choice." The Berkoviches were told their defense by Golden Eagle was being made without reservation and thus they allowed Golden Eagle to assume the defense. It was not until virtually the eve of trial that Golden Eagle first informed the Berkoviches it was disputing coverage after all and it was not until trial was underway that Golden Eagle first informed the Berkoviches of its intent to settle for an amount in excess of its alleged policy limits.

Under the circumstances of the present case we conclude the fact Golden Eagle was authorized by the trial court to engage in settlement of the underlying action without the Berkoviches' consent did not satisfy the requirements as set forth in *Val's Painting* for obtaining reimbursement from the Berkoviches.

V. *The Bercoviches Are Entitled to Recover Attorney Fees Paid to Their Personal Counsel.*

In response to Golden Eagle's letter of October 10, 1989, asserting for the first time denial of coverage under the March 4, 1989 policy, the Berkoviches retained their own counsel, Edgar Fraser. Beginning in December 1989, Mr. Fraser worked extensively on the settlement of the underlying action. ▮ The Berkoviches contend they should be compensated by Foremost and Golden Eagle for Mr. Fraser's fees because the settlement the insurers were pursuing created a conflict of interest between them and the Berkoviches. (See Civ. Code, § 2860; *San Diego Federal Credit Union* v.

*Cumis Ins. Society, Inc.* (1984) 162 Cal.App.3d 358 [208 Cal.Rptr. 494, 50 A.L.R.4th 913] [*Cumis*].) Specifically, the Berkoviches contend the insurers created a conflict of interest by pursuing a settlement without their consent, in excess of the insurers' alleged policy limits and which would leave them exposed to subsequent claims by tenants who were not plaintiffs in the underlying action. The trial court ruled these facts did not trigger the duty to provide the Berkoviches with independent counsel. We disagree.

California courts have long recognized an insurer's duty to defend its insured may conflict with the insurer's own interests resulting in the need for independent counsel to protect the insured when the interests of insurer and insured diverge. (See, e.g., *Tomerlin* v. *Canadian Indemnity Co.* (1964) 61 Cal.2d 638, 648 [39 Cal.Rptr. 731, 394 P.2d 571]; *Executive Aviation, Inc.* v. *National Ins. Underwriters* (1971) 16 Cal.App.3d 799, 809 [94 Cal.Rptr. 347]; *Cumis, supra,* 162 Cal.App.3d at p. 375; *McGee* v. *Superior Court* (1985) 176 Cal.App.3d 221, 226 [221 Cal.Rptr. 421].) In 1987 the Legislature enacted section 2860 of the Civil Code, which codified the *Cumis* rule. That section provides in relevant part: "(a) If the provisions of a policy of insurance impose a duty to defend upon an insurer and a conflict of interest arises which creates a duty on the part of the insurer to provide independent counsel to the insured, the insurer shall provide independent counsel to represent the insured . . . . [¶] (b) For purposes of this section, a conflict of interest does not exist as to allegations or facts in the litigation for which the insurer denies coverage; however, when an insurer reserves its rights on a given issue and the outcome of that coverage issue can be controlled by counsel first retained by the insurer for the defense of the claim, a conflict of interest may exist. No conflict of interest shall be deemed to exist as to allegations of punitive damages or be deemed to exist solely because an insured is sued for an amount in excess of the insurance policy limits."

As statutory and case law make clear, not every conflict of interest triggers an obligation on the part of the insurer to provide the insured with independent counsel at the insurer's expense. For example, the mere fact the insurer disputes coverage does not entitle the insured to *Cumis* counsel; nor does the fact the complaint seeks punitive damages or damages in excess of policy limits. (Civ. Code, § 2860, subd. (b); *Blanchard* v. *State Farm Fire & Casualty Co.* (1991) 2 Cal.App.4th 345, 349 [2 Cal.Rptr.2d 884]; *McGee* v. *Superior Court, supra,* 176 Cal.App.3d at p. 226.) The insurer owes no duty to provide independent counsel in these situations because the *Cumis* rule is not based on insurance law but on the ethical duty of an attorney to avoid representing conflicting interests. As the court stated in the *Cumis* opinion: "We conclude the Canons of Ethics impose upon lawyers hired by the

insurer an obligation to explain to the insured and the insurer the full implications of joint representation in situations where the insurer has reserved its rights to deny coverage. If the insured does not give an informed consent to continued representation, counsel must cease to represent both. Moreover, in the absence of such consent, where there are divergent interests of the insured and the insurer brought about by the insurer's reservation of rights based on possible noncoverage under the insurance policy, the insurer must pay the reasonable cost for hiring independent counsel by the insured. . . . Disregarding the common interests of both insured and insurer in finding total nonliability in the third party action, the remaining interests of the two diverge to such an extent as to create an actual, ethical conflict of interest warranting payment for the insureds' independent counsel." (162 Cal.App.3d at p. 375.) This holding was based on a long line of attorney-client conflict of interest cases as well as the American Bar Association Code of Professional Responsibility. (*Id.* at pp. 364, 366-367, 370-371, 374-375; and see Brown & Romaker, *Cumis, Conflicts and the Civil Code: Section 2860 Changes Little* (1989) 25 Cal.Western L.Rev. 45, 59-63.)

The paradigm case requiring independent counsel is one in which the way counsel retained by the insurance company defends the action will affect an underlying coverage dispute between the insurer and the insured. For example, in *Executive Aviation, Inc.* v. *National Ins. Underwriters, supra,* 16 Cal.App.3d 799, a pilot who did not hold a license to fly passengers in common carriage was employed by Executive Aviation to fly potential buyers of an airplane on a demonstration flight. The plane crashed, killing all on board. The passengers' heirs sued Executive Aviation. Its insurer, National, agreed to provide a defense but reserved the right to deny coverage. If National could prove the flight was a commercial carriage flight there would be no coverage under its policy. On the other hand, if the plane was being used in commercial carriage the plaintiffs' burden of proof against Executive Aviation would be reduced because common carriers are held to a higher standard of care. The court held the reservation of rights in this case created a conflict of interest for the attorney retained by National to defend Executive Aviation. Whichever position the attorney took on the issue of the commercial nature of the flight he would be operating directly against the interests of the insurer or the insured.

 Attorney control of the outcome of a coverage dispute is written into Civil Code section 2860, subdivision (b) as an example of a conflict of interest which may require appointment of independent counsel. It is not, however, the only circumstance in which *Cumis* counsel may be required. The language of Civil Code section 2860 "does not preclude judicial determination of conflict of interest and duty to provide independent counsel such

as was accomplished in *Cumis* so long as that determination is consistent with the section." (*United States Fidelity & Guaranty Co.* v. *Superior Court* (1988) 204 Cal.App.3d 1513, 1525 [252 Cal.Rptr. 320].)[5]

As we noted above, the governing principle underlying *Cumis* and section 2860 is the attorney's ethical duty to the clients. Thus, an attorney representing the interests of the insurer and the insured is subject to the rule a "[c]onflict of interest between jointly represented clients occurs whenever their common lawyer's representation of the one is rendered less effective by reason of his representation of the other." (*Spindle* v. *Chubb/Pacific Indemnity Group* (1979) 89 Cal.App.3d 706, 713 [152 Cal.Rptr. 776].)

We find a clear conflict of interest in the present case entitling the Berkoviches to independent counsel. Here, the Berkoviches refused to consent to a settlement which would exceed the policy limits alleged by their insurers. (Cf. *Bogard* v. *Employers Casualty Co.* (1985) 164 Cal.App.3d 602, 610-611 [210 Cal.Rptr. 578].) As a result, Golden Eagle petitioned the court for permission to settle without the Berkoviches' consent. This petition was brought by independent cousel representing Golden Eagle, not by Mr. Chodzko, the attorney Golden Eagle had retained to represent the Berkoviches. However, Mr. Chodzko recommended to Golden Eagle that the case be settled for an amount in excess of the insurers' alleged policy limits and failed to oppose Golden Eagle's petition for permission to settle even though he knew his clients, the Berkoviches, would be exposed to excess liability and that they opposed the settlement sought by Golden Eagle. Not only was counsel put in the position of representing clients with conflicting positions regarding settlement, one set of clients—the insurers—was seeking to settle the case with the other clients' money. Under these circumstances, we hold the Berkoviches were entitled to independent counsel at the insurers' expense to represent them in the settlement negotiations, including the motion to participate in the settlement without the Berkoviches' consent.

Golden Eagle and Foremost stipulated at trial that they had agreed to share equally in the Berkoviches' defense costs and that the bill for attorney fees submitted by Mr. Fraser was reasonable. Mr. Fraser's bill totaled $10,823.75. Therefore, the Berkoviches are entitled to a judgment on their cross-complaint against Golden Eagle and Foremost in the sum of $10,823.75.

---

[5]We acknowledge there is language in *Blanchard* v. *State Farm Fire & Casualty Co., supra,* 2 Cal.App.4th 345, 350 stating, "A conflict of interest does not arise *unless* the outcome of the coverage issue can be controlled by counsel first retained by the insurer for the defense of the underlying claim." (Italics added.) This statement is mere dictum, however, because the insured in that case was arguing the insurers' reservation of rights per se entitled it to *Cumis* counsel. That argument was clearly erroneous under Civil Code section 2860, subdivision (b).

## DISPOSITION

On the complaint of Golden Eagle against defendants Anton and Cynthia Berkovich, the judgment in favor of the Berkoviches is affirmed. On the complaint of Golden Eagle against defendant Foremost, the judgment is reversed and the trial court is ordered to enter judgment in favor of Golden Eagle and against Foremost in the sum of $450,000. On the cross-complaint of Anton and Cynthia Berkovich against Golden Eagle, the judgment is reversed and the trial court is ordered to enter judgment in favor of the Berkoviches and against Golden Eagle in the sum of $5,411.88. On the cross-complaint of Anton and Cynthia Berkovich against Foremost, the judgment is reversed and the trial court is directed to enter judgment in favor of the Berkoviches and against Foremost in the sum of $249,911.88. The trial court is further directed to determine the entitlement of the Berkoviches and Golden Eagle to interest as provided by law. The judgment awarding costs of suit to Anton and Cynthia Berkovich as against Golden Eagle is modified to award costs of suit against both Golden Eagle and Foremost. The judgment awarding Foremost costs of suit against Golden Eagle is reversed and the trial court is directed to enter judgment awarding Golden Eagle its costs of suit against Foremost.

The Berkoviches are awarded their costs on appeal.

Lillie, P. J., and Woods (Fred), J., concurred.

Petitions for a rehearing were denied January 7, 1994, and the opinion was modified to read as printed above. Respondent's petition for review by the Supreme Court was denied March 17, 1994. Baxter, J., was of the opinion that the petition should be granted.