Filed 1/12/23  WFG National Title Insurance Co. v. Kim CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| WFG NATIONAL TITLE INSURANCE COMPANY, | B315174 |
| Plaintiff and Respondent | (Los Angeles County Super. Ct. No. BC672513) |
| v. | |
| LAURIE KIM, et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mel Red Recana, Judge.  Reversed with directions.

Bahar Law Office and Sarvenaz Bahar for Defendants and Appellants.

Wright, Finlay & Zak and Olivier J. Labarre for Plaintiff and Respondent.

# INTRODUCTION

RNA Financial LLC—a now-insolvent company owned by sisters Laurie and Jamie Kim—purchased a house and obtained a $340,000 loan from Maggie Investments pursuant to a promissory note secured by a deed of trust on the property. Shortly after RNA obtained the loan, the seller rescinded the sale and refunded the purchase price to RNA. RNA, however, did not notify Maggie the sale had been rescinded or pay off the principal owed on the loan. Instead, RNA made interest-only payments on the loan for six years, then stopped making payments when RNA ran out of money. Only then did Maggie learn the seller had rescinded the sale years before.

After Maggie settled a claim against its title insurer, WFG National Title Insurance Company, WFG filed this action in subrogation against RNA and the Kims, asserting causes of action for breach of contract and fraud. WFG alleged that RNA failed to repay the loan and that the Kims, though they did not personally guarantee the loan, were liable for the outstanding debt as alter egos of RNA. RNA did not respond to the complaint, and the trial court entered RNA's default. After a nonjury trial, the court found the Kims were alter egos of RNA and therefore liable for RNA's breach of contract.

The Kims appeal from the judgment, arguing substantial evidence did not support the trial court's finding they were alter egos of RNA. We conclude substantial evidence supported the court's alter ego finding regarding Laurie, who commingled RNA's funds with the funds of other businesses she owned and used RNA's account to pay for personal expenses that had no documented business purpose. We also conclude, however,

substantial evidence did not support the court's alter ego finding regarding Jamie, who did not participate in the operations of RNA or know about Laurie's actions. We also reject the rest of the Kims' arguments they are not liable as alter egos because RNA is not liable for breach of contract, most of which the Kims forfeited by failing to raise at trial. Therefore, we reverse the judgment and direct the trial court to enter a new judgment against RNA and Laurie but in favor of Jamie.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *RNA Purchases a House at a Foreclosure Sale and Obtains a Loan*

The Kims used RNA to purchase, improve, and resell real property to third parties, a process the Kims refer to as "flipping houses." Laurie was the managing member, president, and secretary, with sole authority to transfer property on behalf of the company.

In August 2009 RNA purchased a house in Pasadena at a foreclosure sale for $488,500 in cash. Soon thereafter, RNA obtained a $340,000 loan from Maggie, evidenced by a promissory note and secured by a deed of trust on the property. The terms of the note required RNA to make monthly, interest-only payments for three years at the annual rate of 12 percent, with a balloon payment of all outstanding principal due at the end of the note's three-year term. The note provided that, if RNA defaulted, interest on the outstanding principal would continue to accrue at the same rate.

3

B.    *The Foreclosure Trustee Rescinds the Sale, but RNA Does Not Notify Maggie*

A few months after RNA purchased the house, Executive Trustee Services (ETS), the trustee who conducted the foreclosure sale, rescinded the sale and recorded a notice of recission with the Los Angeles County Recorder.[1]  RNA received a refund of the $488,500 purchase price, but did not pay off any principal on the loan or notify Maggie that ETS had rescinded the sale.  RNA continued to make interest-only payments on the loan until the three-year term ended.  At the end of the term, RNA did not make the required balloon payment, but for three more years continued to make the same monthly payments on the loan, which Maggie accepted.

C.    *RNA Stops Making Payments, Maggie Tenders a Claim to WFG, and WFG Sues RNA and the Kims*

RNA stopped making payments to Maggie after October 2015.  In February 2016 Maggie attempted to initiate foreclosure proceedings based on the deed of trust it believed secured the loan, but the trustee advised Maggie the sale to RNA had been rescinded.  Maggie tendered a claim to WFG under its title insurance policy on the deed of trust, which WFG settled by paying Maggie $340,000.  As part of the settlement, Maggie assigned to WFG all claims arising from the promissory note.

---

[1]    The notice stated the beneficiary of the deed of trust that previously encumbered the property determined the sale "was conducted in error due to a failure to communicate timely . . . notice of conditions which would have warranted a cancellation of the foreclosure . . . ."

4

In 2017 WFG filed this action against RNA and the Kims, asserting causes of action for fraud and breach of contract. WFG alleged RNA breached the loan agreement "by failing to repay the sums due under the Promissory Note." WFG alleged the Kims were liable for breach of contract as alter egos of RNA because they did not maintain adequate capital in the company to satisfy its debts and withdrew funds from the company's bank accounts for their personal use. WFG further alleged the Kims concealed from Maggie that ETS rescinded the sale.

D.     *WFG and the Kims Go to Trial*

RNA did not respond to the complaint, and the trial court entered its default. The Kims, however, did respond and went to trial on WFG's causes of action against them.

At trial Laurie testified that RNA had only one bank account and that she was the only person who had a checkbook or debit card for the account. WFG introduced into evidence RNA's bank records from April 2012 (a few months before the end of the original three-year loan term) to September 2015. During that period RNA generally had less than $50,000 in its account, and often as little as several thousand dollars or even a few hundred dollars. RNA received two large deposits during those years: one for $100,000 from a company Laurie admitted she owned, and another for $153,000. After receiving each deposit, RNA almost immediately paid a third party for either the same or nearly the same amount. RNA received a handful of smaller deposits from companies Laurie also admitted she owned, but otherwise received little income.

The bank records reflected that RNA made numerous, recurring purchases at department stores, clothing stores

5

(including children's clothing stores), restaurants, and cosmetic stores, plus occasional purchases at, for example, sporting goods stores, bookstores, and for children's "school lunch programs." Laurie stipulated she made all the purchases. She testified that the purchases at restaurants were during meetings with "potential investors" and that the purchases at department stores and shops were "marketing expenses" to "build . . . relationship[s]" and "get more business." Laurie admitted, however, she never documented what she purchased or to whom she gave any of the items. She also could not recall the purpose of several purchases, other than to say they "could" have been for networking events.

WFG presented little evidence Jamie participated in RNA's operations. The parties stipulated that "[a]t all relevant times" Jamie had no knowledge of the Pasadena property, the loan from Maggie, or the recission. Between April 2012 and September 2015, RNA's records reflected three deposits, totaling $3,000, from an account jointly held by Laurie and Jamie. During that same period RNA made one $30,000 payment to Jamie. Jamie testified Laurie performed all of RNA's business operations.

E.    *The Court Rules for WFG*

The trial court ruled in favor of WFG on its breach of contract cause of action against RNA and against WFG on its fraud cause of action. The court, in a statement of decision, found RNA "breached its contractual obligations to Maggie . . . by failing to repay the principal amount of the Loan when due, by defaulting on the interest-only payments, and by failing to disclose the existence of the Recission to Maggie." The court further found that each of the Kims was liable for the breach

6

under the alter ego doctrine.  The court found that Laurie "had complete control" over RNA's account; that Laurie "routinely used her own funds to finance RNA's business operations, through cash infusions"; and that RNA's bank statements "reflect[ed] numerous personal expenses . . . that had nothing to do with the real estate business of RNA . . . ."  The court stated that, "[a]lthough the Kims testified that some of the expenses . . . were incurred for business reasons," the Kims "failed to present evidence that the bulk of the transactions . . . were not incurred for personal reasons."  The court's only specific findings regarding Jamie were that Jamie performed "numerous administrative tasks for RNA over the years, including signing checks and executing all of the various Secretary of State filings for RNA," and that Jamie received the $30,000 payment from RNA.

The court entered judgment in favor of WFG and against RNA and the Kims, jointly and severally, in the amount of $556,853.20, consisting of $340,000 in principal that RNA owed on the loan, plus $216,853 in interest that had accrued since November 2015, when RNA stopped making payments.  The Kims timely appealed from the judgment.

## DISCUSSION

### A.    *Standard of Review*

On appeal from a judgment based on a statement of decision following a court trial, we "review questions of law de novo and we review the trial court's findings of fact under the substantial evidence standard."  (*Gajanan Inc. v. City and County of San Francisco* (2022) 77 Cal.App.5th 780, 791-792; see *Thompson v. Asimos* (2016) 6 Cal.App.5th 970, 981.)  "We

7

construe findings of fact liberally to support the judgment; consider the evidence in the light most favorable to the judgment; draw all reasonable inferences in support of the findings; and infer that the trial court "'impliedly made every factual finding necessary to support its decision.'"" (*Gajanan*, at pp. 791-792; see *Thompson*, at p. 981; *Barickman v. Mercury Casualty Co.* (2016) 2 Cal.App.5th 508, 516.)

B.     *Alter Ego Doctrine*

The Kims argue the trial court erred in ruling they were alter egos of RNA and therefore liable for the judgment against it.  They are half right:  Substantial evidence supported the court's finding Laurie was the alter ego of RNA, but not the court's finding Jamie was.

1.     *Applicable Law*

""'Ordinarily, a corporation is regarded as a legal entity, separate and distinct from its stockholders, officers and directors, with separate and distinct liabilities and obligations.'"" (*Eleanor Licensing LLC v. Classic Recreations LLC* (2018) 21 Cal.App.5th 599, 615; see *Leek v. Cooper* (2011) 194 Cal.App.4th 399, 411.) "In certain circumstances," however, "the court will disregard the corporate entity and will hold the individual shareholders liable for the actions of the corporation:  'As the separate personality of the corporation is a statutory privilege, it must be *used* for legitimate business purposes and must not be perverted.  When [the privilege] is abused it will be disregarded,' and the individuals will be 'liable for acts done in the name of the corporation.'" (*Mesler v. Bragg Management Co.* (1985) 39 Cal.3d 290, 300; see *Cam-Carson, LLC v. Carson Reclamation Authority*

8

(2022) 82 Cal.App.5th 535, 550; *Kao v. Holiday* (2020) 58 Cal.App.5th 199, 205;.)

"'In California, two conditions must be met before the alter ego doctrine will be invoked.  First, there must be such a unity of interest and ownership between the corporation and its equitable owner that the separate personalities of the corporation and the shareholder do not in reality exist.  Second, there must be an inequitable result if the acts in question are treated as those of the corporation alone.'" (*Cam-Carson, LLC v. Carson Reclamation Authority*, *supra*, 82 Cal.App.5th at p. 549; see *Troyk v. Farmers Group, Inc.* (2009) 171 Cal.App.4th 1305, 1341.) "We uphold a trial court's ruling of alter ego liability if it is supported by substantial evidence, as the invocation of alter ego liability 'is primarily one for the trial court and is not a question of law.'" (*Kao v. Holiday*, *supra*, 58 Cal.App.5th at p. 206; see *Baize v. Eastridge Companies, LLC* (2006) 142 Cal.App.4th 293, 302; *Alexander v. Abbey of Chimes* (1980) 104 Cal.App.3d 39, 47.)

>    2.      *The Trial Court Did Not Err in Ruling Laurie Was Liable Under the Alter Ego Doctrine*

>        a.      *The Doctrine of Implied Findings Applies*

As a preliminary matter, the Kims contend the doctrine of implied findings does not apply to the trial court's determination Laurie was liable as an alter ego of RNA.  "'[U]nder the doctrine of implied findings, the reviewing court [generally] must infer, following a bench trial, that the trial court impliedly made every factual finding necessary to support its decision.'" (*Thompson v. Asimos*, *supra*, 6 Cal.App.5th at p. 981; see *Fladeboe v. American Isuzu Motors Inc.* (2007) 150 Cal.App.4th 42, 48.)  Code of Civil

9

Procedure section 634 establishes an exception: "When a statement of decision does not resolve a controverted issue, or if the statement is ambiguous and the record shows that the omission or ambiguity was brought to the attention of the trial court" before entry of judgment, "it shall not be inferred on appeal . . . that the trial court decided in favor of the prevailing party as to those facts or on that issue."

In finding each of the Kims was an alter ego of RNA, the trial court made numerous relevant findings, but did not use the words "unity of interest" or "inequitable result." The Kims objected to the proposed statement of decision, asserting the court did not identify "*specific factors* upon which the trial court relied to find a unity of interest and an equitable result justifying application of the alter ego doctrine." The Kims argue that, because the trial court did not "mention the two mandatory conditions for alter ego liability," this court should "limit its review to the trial court's *express* findings set forth in the statement of decision . . . ."

The Kims are incorrect. Even where a party brings omissions or ambiguities in a proposed statement of decision to the attention of the trial court, "'[t]he trial court is not required to respond point by point to the issues posed . . . . The court's statement of decision is sufficient if it fairly discloses the court's determination as to the ultimate facts and material issues in the case.'" (*Thompson v. Asimos*, *supra*, 6 Cal.App.5th at p. 983; see *Pannu v. Land Rover North America, Inc.* (2011) 191 Cal.App.4th 1298, 1314, fn. 12; *Golden Eagle Ins. Co. v. Foremost Ins. Co.* (1993) 20 Cal.App.4th 1372, 1379-1380.) The trial court "is not expected to make findings with regard to 'detailed evidentiary facts or to make minute findings as to individual items of

10

evidence.'" (*Thompson*, at p. 983; see *Nunes Turfgrass, Inc. v. Vaughan-Jacklin Seed Co.* (1988) 200 Cal.App.3d 1518, 1525.)

No doubt it would have been better if the trial court had specified which facts supported the court's implied finding there was a unity of interest between each of the Kims and RNA and which facts supported the court's implied finding there would be an inequitable result if the Kims were not liable as alter egos for RNA's breach of contract. (See *Thompson v. Asimos*, *supra*, 6 Cal.App.5th at p. 983 ['"the term "ultimate fact" generally refers to a core fact, such as an essential element of a claim"'].) In requesting a statement of decision, however, the Kims identified 57 issues they deemed the "principal controverted issues" at trial, making it nearly impossible for the trial court to determine which issues the Kims deemed necessary for the court to resolve prior to entering judgment. (See *People v. Casa Blanca Convalescent Homes, Inc.* (1984) 159 Cal.App.3d 509, 525 [trial court "was not required to provide specific answers" to a request for statement of decision asking the court "to answer over 75 questions and make a list of findings on evidentiary facts"]; *Kanner v. Globe Bottling Co.* (1969) 273 Cal.App.2d 559, 567 ["[p]laintiffs' request for 66 special findings was properly denied by the trial court" because Code of Civil Procedure "[s]ection 634 does not require that a finding be made as to every minute matter on which evidence is received at the trial"].) The Kims also did not identify proposed findings in their request; they simply listed the 57 issues in the form of questions without proposed answers. (See *In re Marriage of Falcone & Fyke* (2012) 203 Cal.App.4th 964, 981-982 [court did not have to respond to a request for statement of decision "that made a laundry list of 52 demands" and did not "suggest[ ] the specific factual finding

11

requested"; ""'[t]he established practice presupposes that counsel desiring such special findings will draft and propose them in the usual form,'"" and ""'[t]he action of the court in approving or disapproving them will constitute the ruling'"""].) Moreover, in objecting to the court's proposed statement of decision, the Kims did not make clear whether they were requesting a general finding on all facts relevant to the court's alter ego determination or whether they were asking for separate findings on the issues of unity of interest and inequitable result. While the Kims did mention both conditions, they defined the controverted issues as Laurie's and Jamie's "Liability as an Alter Ego of RNA" and asked the trial court to "state the legal and factual basis for its holding that" Laurie and Jamie each acted as "an alter ego of RNA."

In any event, the trial court fairly and sufficiently identified the facts that supported its finding of alter ego liability—at least for Laurie. The court found RNA never had any employees or offices, had limited assets, and followed few corporate formalities. The court found Laurie used her personal funds to finance RNA, used RNA funds to make purchases unrelated to RNA's business, and failed to show a business purpose for the purchases. The court also found Laurie never notified Maggie of the recission or that Maggie had lost its security interest in the Pasadena property. And, the court found, rather than "paying off Maggie's unsecured loan," RNA used the funds from the recission for other purposes and "benefitted from the fact that Maggie did not call the [l]oan due" at the end of the three-year term because RNA otherwise could not have continued to operate. Because the court sufficiently explained the basis of its finding Laurie was an alter ego of RNA, we infer all findings

12

necessary to support the judgment against her. (See *Yield Dynamics, Inc. v. TEA Systems Corp.* (2007) 154 Cal.App.4th 547, 559 ["it is settled that the trial court need not, in a statement [of] decision, 'address all the legal and factual issues raised by the parties'"]; *Whitney Inv. Co. v. Westview* (1969) 273 Cal.App.2d 594, 604 [purpose of Code of Civil Procedure section 634 is to "provide sufficient guidance to enable a reviewing court to determine how the trial court resolved material issues in the case"].)

> b. *Substantial Evidence Supported the Finding Laurie Was an Alter Ego of RNA*

The many factors (*Associated Vendors, Inc. v. Oakland Meat Co.* (1962) 210 Cal.App.2d 825, 838-840) relevant to the first condition—unity of interest and ownership—include (1) "[c]ommingling of funds and other assets, failure to segregate funds of the separate entities, and the unauthorized diversion of corporate funds or assets to other than corporate uses"; (2) "the treatment by an individual of the assets of the corporation as his own"; and (3) "the disregard of legal formalities and the failure to maintain arm's length relationships among related entities." (*Greenspan v. LADT LLC* (2010) 191 Cal.App.4th 486, 512-513, internal quotation marks omitted; see *Kao v. Holiday*, *supra,* 58 Cal.App.5th at p. 206.) An additional important factor "is that a legal entity is so undercapitalized that it is likely to have no sufficient assets to meet its debts." (*Triyar Hospitality Management, LLC v. WSI (II)—WHP, LLC* (2020) 57 Cal.App.5th 636, 642; see *Butler America, LLC v. Aviation Assurance Co., LLC* (2020) 55 Cal.App.5th 136, 146.) "No single factor is determinative, and instead a court must examine all the

13

circumstances to determine whether to apply the doctrine." (*Misik v. D'Arco* (2011) 197 Cal.App.4th 1065, 1073, internal quotation marks omitted; see *Zoran Corp. v. Chen* (2010) 185 Cal.App.4th 799, 812.)

The unity of interest and ownership between Laurie and RNA was obvious. RNA had only one bank account, and Laurie admitted she was the only one who controlled the checkbook and debit card for the account. Laurie admitted she commingled funds by transferring money into RNA from other companies she owned. Laurie treated the assets of the corporation as hers and disregarded legal formalities by regularly making purchases at department and clothing stores and restaurants without documenting any of the purchases (much less documenting a business purpose). She also operated RNA without sufficient capital to meet its outstanding debts. At all times between April 2012, the earliest date for which RNA presented any bank records, and November 2015, RNA owed $340,000 in principal to Maggie under the loan, yet never held more than $50,000 in its only account for more than a couple of weeks. And while Laurie testified RNA purchased "dozens" of other real properties during the six years it was making interest-only payments to Maggie, Laurie did not present any records showing RNA held title to real property or owned other assets during that time (the type of record one might expect a business to keep, or obtain, if it in fact held title to real property or assets).

Laurie argues WFG "did not satisfy its burden of proof" to show Laurie's debit purchases "were incurred for personal reasons" because "there [were] many possible business-related reasons" for the purchases. Laurie's argument misapprehends the issue. WFG did not have to prove each purchase Laurie made

14

on behalf of RNA was for a personal rather than business reason (although Laurie admitted that at least some of the payments, such as those for her children's school lunch programs, were for personal reasons). The fact that Laurie regularly made purchases using RNA's accounts without documenting the purpose of the purchases evidenced a unity of interest between Laurie and RNA. (See *Blizzard Energy, Inc. v. Schaefers* (2021) 71 Cal.App.5th 832, 850 [owner's transfer of funds from the company "without specifying the reason for the transfer" and "failure to maintain any documentation for when and why funds [were] distributed" supported a finding of a unity of interest]; *Kao v. Holiday*, *supra*, 58 Cal.App.5th at p. 206 ["[f]actors a trial court may consider when deciding unity of interest" include "the failure to maintain . . . adequate corporate records"]; *Misik v. D'Arco*, *supra*, 197 Cal.App.4th at p. 1073 [same].) The court was also not required to find credible (and in all likelihood no reasonable person would have found credible) Laurie's testimony that the purchases at restaurants, department stores, clothing stores, and from other merchants were "marketing" expenses, particularly given that she never documented the transactions and could not recall specific items she purchased or the actual or potential clients for whom she allegedly made purchases. (See *Butler America, LLC v. Aviation Assurance Co., LLC*, *supra*, 55 Cal.App.5th at p. 146 [trial court did not err in finding not credible an owner's testimony that payments from companies were "loans"]; *Turman v. Superior Court* (2017) 17 Cal.App.5th 969, 981 ["assessing credibility and weighing the extensive and conflicting testimony" on alter ego liability was for the trial court, not reviewing court].)

15

For the second requirement of the alter ego doctrine, that there would be an inequitable result if the acts in question were treated as those of the corporation, there are few hard-and-fast rules. "The essence of the alter ego doctrine is that justice be done. 'What the formula comes down to . . . is that liability is imposed to reach an equitable result[ ]' . . . when the ends of justice so require." (*Mesler v. Bragg Management Co.*, *supra*, 39 Cal.3d at p. 301.) Some courts have stated that "[d]ifficulty in enforcing a judgment does not alone satisfy this element" and that "[t]here also must be some conduct amounting to bad faith that makes it inequitable for [the individual] to hide behind the corporate form." (*Leek v. Cooper*, *supra*, 194 Cal.App.4th at p. 418; see *Sonora Diamond Corp. v. Superior Court* (2000) 83 Cal.App.4th 523, 539.) More recently, other courts have rejected this authority, stating that the party seeking to hold a defendant liable under an alter ego theory need not show wrongful intent, but "that the alter ego's acts caused an inequitable result . . . ." (*Triyar Hospitality Management, LLC v. WSI (II)—HWP, LLP*, *supra*, 57 Cal.App.5th at p. 642; see *Relentless Air Racing, LLC v. Airborne Turbine Ltd. Partnership* (2013) 222 Cal.App.4th at p. 816.)

Laurie contends she did not engage in bad faith because she had no duty to disclose the recission of the Pasadena house sale to Maggie. Laurie's argument again misapprehends the law. (See *Misik v. D'Arco*, *supra*, 197 Cal.App.4th at p. 1074 ["fraud [is] not required to apply the alter ego doctrine"].) Even if Laurie did not have a duty to notify Maggie of the recission (and even if WFG had to show Laurie engaged in bad faith), there was substantial evidence Laurie deliberately kept RNA without adequate capital to pay off the principal due on the loan. That

16

was sufficient, for purposes of the alter ego doctrine, to show bad faith and an inequitable result.  As the Supreme Court has explained, "'If a corporation is organized and carries on business without substantial capital in such a way that the corporation is likely to have no sufficient assets available to meet its debts, it is inequitable that shareholders should set up such a flimsy organization to escape personal liability. . . .  [T]he policy of the law [is] that shareholders should in good faith put at the risk of the business unincumbered capital reasonably adequate for its prospective liabilities.  If the capital is illusory or trifling compared with the business to be done and the risks of loss, this is a ground for denying the separate entity privilege.'" (*Automotriz Del Golfo De California S. A. De C. V. v. Resnick* (1957) 47 Cal.2d 792, 797; see *Remme v. Herzog* (1963) 222 Cal.App.2d 863, 867.)

Here, the parties stipulated RNA had $488,500 in cash after ETS rescinded the sale of the Pasadena property in January 2010.  When RNA received the refund, Laurie knew RNA owed Maggie $340,000 in principal on the loan, which RNA would have to pay in approximately two years.  Yet Laurie did not direct RNA to repay Maggie or keep some of the proceeds from the refund with RNA to cover the outstanding debt.  The record does not reflect where the $488,500 went, but it is clear it did not stay with RNA.[2]  By April 2012 RNA had only $44,000 in its bank

---

[2]    Laurie testified, and the trial court found, RNA used the refund to purchase and invest in other properties (even though Laurie presented no documentary evidence to support her testimony).  Even if RNA used the money on other properties, there was no evidence RNA retained title to the properties.

17

account, and Laurie presented no evidence RNA held any assets other than the $44,000 after April 2012.  For the next three years RNA never had more than $50,000 in its account, and Laurie routinely made purchases from the account that had no documented business purpose.  A reasonable inference from this evidence was that, in order to avoid paying a known, outstanding debt, Laurie deliberately chose to remove cash that RNA could have used to pay the debt.  (See *Gomez v. Smith* 54 Cal.App.5th 1016, 1026 [under implied-findings doctrine, "'"[w]here a statement of decision sets forth the factual and legal basis for the decision, any conflict in the evidence or reasonable inferences to be drawn from the facts will be resolved in support of the determination of the trial court decision"'"].)  It would be inequitable if WFG recovered less as a result of Laurie's actions.  (See *Triyar Hospitality Management, LLC v. WSI (II)*, *supra*, 57 Cal.App.5th at p. 642 [maintaining separate corporate liability would cause an inequitable result where the company "never had sufficient capital" to complete a proposed transaction underlying the lawsuit and it was "highly unlikely [the company] would ever have assets to satisfy the judgment"]; *Relentless Air Racing, LLC v. Airborne Turbine Ltd. Partnership*, *supra*, 222 Cal.App.4th at p. 816 ["it would be inequitable as a matter of law" to maintain separate liability for a company where the principals used the company's funds "to pay their personal debts" and, since the beginning of litigation, the company never had substantial assets from which it could satisfy a judgment]; see also *Butler America, LLC v. Aviation Assurance Co., LLC*, *supra,* 55 Cal.App.5th at p. 139 ["[a] judgment debtor with an empty shell is easy to crack"].)

### 3. *Substantial Evidence Did Not Support the Finding Jamie Was an Alter Ego of RNA*

Jamie contends the trial court erred in ruling she was liable for the judgment against RNA under the alter ego doctrine. Jamie has a point: Substantial evidence did not support the court's finding there was a unity of interest between Jamie and RNA.

As discussed, factors relevant to the unity-of-interest requirement include that the shareholder commingled funds and other assets, diverted corporate funds or assets to non-corporate uses, treated the assets of the corporation as his or hers, disregarded legal formalities, and kept the corporation undercapitalized to avoid paying its debts. (*Blizzard Energy, Inc. v. Schaefers*, *supra*, 71 Cal.App.5th at p. 849). The problem for WFG is that all of the evidence at trial showed Laurie, not Jamie, was the person who performed each of these acts. The parties stipulated that only Laurie had the authority to transfer or borrow against RNA's properties and that Jamie had no knowledge of RNA's purchase of the Pasadena property, the loan from Maggie, or the recission. There was no evidence Jamie had a debit card associated with RNA's account or made any purchases on behalf of RNA. WFG introduced only two checks Jamie signed on behalf of RNA, but both had a documented business purpose: One was a check to the California Franchise Tax Board and one was a check to the California Secretary of State. Each check referenced RNA's Statement of Information.[3]

---

[3] The trial court found Jamie performed "administrative tasks for RNA over the years," but the only evidence was that Jamie signed the corporation's governing documents and documents filed with the Secretary of State.

19

The only evidence potentially showing a unity of interest between Jamie and RNA was the series of three checks totaling $2,000 to RNA from an account jointly held by Laurie and Jamie (each signed and endorsed by Laurie) and one check from RNA to Jamie for $30,000 (also signed by Laurie). While there was no evidence of the purpose of these payments, the evidence was still insufficient to show the unity of interest necessary to find Jamie was an alter ego of RNA. (See *Kao v. Holiday*, *supra*, 58 Cal.App.5th at p. 205 [trial court must find "such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist"]; *Highland Springs Conference & Training Center v. City of Banning* (2016) 244 Cal.App.4th 267, 281 ["The standards for the application of alter ego principles are high, and the imposition of [alter ego] liability . . . is to be exercised reluctantly and cautiously."].)

To hold an individual liable as an alter ego of a company, usually that individual "must have been an actor in the course of conduct constituting the 'abuse of corporate privilege' . . . ." (*United States Fire Ins. Co. v. National Union Fire Ins.* (1980) 107 Cal.App.3d 456, 472.) That was not the case for Jamie. Laurie directed essentially all the company's transactions. Had Jamie regularly received money from RNA, perhaps WFG might have been able to show Jamie was an alter ego of RNA. But the evidence showed Jamie only received one payment, and absent evidence she was at least aware of or benefitted from Laurie not using the company for a legitimate business purpose, substantial evidence did not support the trial court's implied finding there was a unity of interest between RNA and Jamie. (See *Highland Springs Conference and Training Center v. City of Banning*, *supra*, 244 Cal.App.4th, at p. 281 ["courts must consider all of the

20

circumstances of the case in determining whether . . . to impose alter ego liability"].)

C.   *The Trial Court Did Not Err in Ruling WFG Was Entitled To Recover Under Equitable Subrogation*

1.   *Applicable Law*

Subrogation is "the substitution of another person in place of the creditor or claimant to whose rights he or she succeeds in relation to the debt or claim.  [Citation.]  It provides a method of compelling the ultimate payment by one who in justice and good conscience *ought* to make it—of putting the charge where it justly belongs."  (*Western Heritage Ins. Co. v. Frances Todd, Inc.* (2019) 33 Cal.App.5th 976, 983 (*Western Heritage*), internal quotation marks omitted; see *State Farm General Ins. Co. v. Wells Fargo Bank, N.A.* (2006) 143 Cal.App.4th 1098, 1105 (*State Farm*).)

"In the case of insurance, subrogation takes the form of an insurer's right to be put in the position of the insured in order to pursue recovery from third parties legally responsible to the insured for a loss which the insurer has both insured and paid. [Citation.]  The right of subrogation is purely derivative.  An insurer entitled to subrogation is in the same position as an assignee of the insured's claim, and succeeds only to the rights of the insured."  (*Western Heritage, supra*, 33 Cal.App.5th at p. 983, internal quotation marks omitted; accord, *State Farm, supra*, 143 Cal.App.4th at p. 1106; see *Garbell v. Conejo Hardwoods, Inc.* (2011) 193 Cal.App.4th 1563, 1571 ["subrogation does no more than assign to the insurer the claims of its insured against the legally responsible party"].)

"'While the insurer by subrogation steps into the shoes of the insured, that substitute position is qualified by a number of equitable principles. . . .'" (*Western Heritage*, *supra*, 33 Cal.App.5th at p. 984; see *State Farm*, *supra*, 143 Cal.App.4th at pp. 1106-1107.)  Even where, as here, the insured assigns its causes of action to its insurer, the insurer still must show it is entitled to equitable subrogation to recover against the defendant.  (See *San Diego Assemblers, Inc. v. Work Comp for Less Ins. Services, Inc.* (2013) 220 Cal.App.4th 1363, 1368 ["""one who asserts a right of subrogation, whether by virtue of an assignment or otherwise, must first show a *right in equity* to be entitled to such subrogation, or substitution""""]; see also *Meyers v. Bank of America National Trust & Savings Association* (1938) 11 Cal.2d 92, 96; *Dobbas v. Vitas* (2011) 191 Cal.App.4th 1442, 1446.)

"There are eight elements of an insurer's cause of action for equitable subrogation:  '[1] the insured suffered a loss for which the defendant is liable, either as the wrongdoer whose act or omission caused the loss or because the defendant is legally responsible to the insured for the loss caused by the wrongdoer; [2] the claimed loss was one for which the insurer was *not* primarily liable; [3] the insurer has compensated the insured in whole or in part for the same loss for which the defendant is primarily liable; [4] the insurer has paid the claim of its insured to protect its own interest and not as a volunteer; [5] the insured has an existing, assignable cause of action against the defendant which the insured could have asserted for its own benefit had it not been compensated for its loss by the insurer; [6] the insurer has suffered damages caused by the act or omission upon which the liability of the defendant depends; [7] justice requires that

22

the loss be entirely shifted from the insurer to the defendant, whose equitable position is inferior to that of the insurer; and [8] the insurer's damages are in a liquidated sum, generally the amount paid to the insured.'" (*Pulte Home Corp. v. CBR Electric, Inc.* (2020) 50 Cal.App.5th 216, 229; see *Western Heritage, supra,* 33 Cal.App.5th at p. 983; *Interstate Fire & Casualty Ins. Co. v. Cleveland Wrecking Co.* (2010) 182 Cal.App.4th 23, 33-34.) The Kims contend RFG did not satisfy elements [1], [2], and [7].

In the trial court the Kims did not challenge WFG's right to bring this action in subrogation or argue WFG failed to prove any of the elements of an insurer's cause of action for equitable subrogation. The Kims did not raise the issue in their trial brief, in their request for a statement of decision, or in their objections to the trial court's proposed statement of decision. (See *Hewlett-Packard Co. v. Oracle Corp.* (2021) 65 Cal.App.5th 506, 548 ["[a]s a general rule, theories not raised in the trial court cannot be asserted for the first time on appeal"].) To allow parties like the Kims to raise such arguments for the first time on appeal is not only "unfair to the trial court, but manifestly unjust to the opposing litigant. Only when the issue presented involves purely a legal question, on an uncontroverted record and requires no factual determinations, is it appropriate to address new theories." *Mattco Forge, Inc. v. Arthur Young & Co.* (1997) 52 Cal.App.4th 820, 847, internal quotation marks and citations omitted.) And even then, whether the reviewing court reaches purely legal issues raised for the first time on appeal is discretionary. (*Meridian Financial Services, Inc. v. Phan* (2021) 67 Cal.App.5th 657, 700; *Wittenberg v. Bornstein* (2020) 51 Cal.App.5th 556, 567.) The Kims ask us to exercise our discretion here because,

according to them, whether WFG has an equitable right to subrogation is a "question[ ] of law" based on "undisputed facts."

For the first two elements they challenge ([1] and [2]), the Kims are correct that the relevant facts are undisputed. The problem for them, however, is that the undisputed facts are against them: The insured, Maggie, suffered a loss for which the defendant (RNA) was liable and for which the insurer (WFG) was not primarily liable. For the third element—whether WFG's equitable position was inferior to that of RNA ([7])—the facts were not undisputed, and it is not an issue of law we may review on appeal.

2. *RNA Is Liable for Maggie's Loss, and WFG Was Not Primarily Liable*

The Kims argue that RNA was not liable for Maggie's loss and that WFG was primarily liable. According to the Kims, because RNA did not agree to the recission, ETS (the foreclosure trustee who rescinded the house sale), not RNA, was responsible for Maggie's loss. The Kims argue WFG also (or perhaps alternatively) was "primarily responsible" for Maggie's loss because it had a continuing duty to review the public records of the Pasadena property and the deed of trust that secured the loan. Had WFG complied with that duty, the Kims contend, WFG would have discovered the sale of the property had been rescinded and would have notified Maggie of the recission, which would have allowed Maggie to sue RNA while RNA still had assets.

The Kims' arguments do not persuade. It was undisputed RNA took out a loan, had a legal duty to Maggie to pay back the loan, and breached that duty by failing to do so. Regardless of

24

whether other parties also contributed to Maggie's loss, there was no dispute Maggie suffered a loss for which RNA is liable "as the wrongdoer whose act or omission"—failing to repay the loan—"caused the loss . . . ." (*Pulte Home Corporation v. CBR Electric, Inc.*, *supra*, 50 Cal.App.5th at p. 229.) WFG satisfied the first element of its equitable subrogation cause of action.

It was also undisputed that WFG was not "primarily liable" for Maggie's loss. (*Pulte Home Corporation v. CBR Electric, Inc.*, *supra*, 50 Cal.App.5th at p. 229.) Usually this element is only at issue when multiple insurers are potentially liable for a covered loss, and one insurer seeks to recover from the other. For example, as between primary and excess insurers, "the primary insurer is obligated to defend the insured and must bear 100 percent of the defense costs until the primary limits have been exhausted. [Citations.] Thus, an excess insurer that pays defense costs will frequently obtain a full recovery against the primary insurer," who is primarily liable for the loss for purposes of equitable subrogation. (*Maryland Cas. Co. v. Nationwide Mutual Ins. Co.* (2000) 81 Cal.App.4th 1082, 1089; see *Fireman's Fund Ins. Co. v. Maryland Cas. Co.* (1998) 65 Cal.App.4th 1279, 1298-1299.)

The Kims cite no authority that an insurer is "primarily liable" for a loss when the insurer seeks to enforce subrogation rights against a wrongdoer who caused the loss, rather than against another insurer who (also) indemnified against the loss. In any event, WFG is not primarily liable because its alleged negligence in failing to discover the recission was not the primary cause of Maggie's loss; at most, WFG's negligence prevented Maggie from mitigating its damages caused in the first instance by RNA's misconduct. The purpose of the deed of trust on the

25

property was to secure the loan if RNA did not repay the loan. True, WFG may have been a little careless in failing to adequately research who held title to the property and failing to discover the recission. But for Maggie to suffer any loss as a result of WFG's negligence, RNA first had to breach the note by failing to pay back the principal. WFG was not primarily liable for the loss. (See *Fireman's Fund Ins. Co. v. Morse Signal Devices* (1984) 151 Cal.App.3d 681, 686, 688 [where a premises insurer brought a subrogation action against a fire and burglar alarm company alleging the alarms "failed to function properly," the "primary cause of the loss [was] the creator of the fire or the burglar," and the alarm companies' "alleged negligence [was] secondary"]; *Continental Ins. Co. v. Morgan, Olmstead, Kennedy & Gardner, Inc.* (1978) 83 Cal.App.3d 593, 604 [where a bank's insurer brought a subrogation action against a broker who had purchased treasury bills stolen from the bank by a third party, "the primary cause of the loss was the theft . . . of the treasury bills," and any negligence by the broker in failing to discover facts regarding the theft was "secondary"].)

3. *The Undisputed Facts Did Not Show WFG's Equitable Position Was Inferior to RNA's Position*

The Kims also argue the undisputed facts showed WFG's equitable position was inferior to RNA's position. The facts on this issue, however, were not undisputed.

"In comparing the relative positions of the parties," for purposes of determining which party has the superior equitable position, "a court is required to determine who ultimately ought to bear the loss. [Citation.] However, 'there is no facile formula for determining superiority of equities, for there is no formula by

26

which to determine the existence or nonexistence of an equity except to the extent that certain familiar fact combinations have been repeatedly adjudged to create an equity in the surety or the third party. . . . [Ultimately] the right of subrogation "may be invoked against a third party only if he is guilty of some wrongful conduct which makes his equity inferior to that of the [surety or insurer].""" (*State Farm*, *supra*, 143 Cal.App.4th at p. 1112; see *Golden Eagle Ins. Co. v. First Nationwide Financial Corp.*, *supra*, 26 Cal.App.4th at p 171.) "[E]ach case comes down to the question of fault of some kind," although "not necessarily negligence or proximate negligence." (*State Farm*, at p. 1112; see *Hartford Acc. & Indem Co. v. All Am. Nut Co.* (1963) 220 Cal.App.2d 545, 558.)

Although the Kims assert the facts were undisputed, the parties dispute whether, and to what extent, WFG was negligent in failing to discover the recission. (See *Hernandez v. Jensen* (2021) 61 Cal.App.5th 1056, 1064 [on a negligence cause of action, the element of "breach of duty" is "ordinarily [a] question[ ] of fact"]; *Minnegren v. Nozar* (2016) 4 Cal.App.5th 500, 508 ["'on the question of negligence or contributory negligence of a party[,] . . . if the party involved did exercise some care, the question of whether or not that care was all that an ordinarily reasonable person would have taken under the circumstances of the case continues to be a question of fact for determination of the court or jury'"]; *Lindstrom v. Hertz Corp.* (2000) 81 Cal.App.4th 644, 652 [""[i]n general, the issue of a defendant's negligence presents a question of fact""].) Dawn Weller, WFG's claims officer, testified WFG would have received a copy of the notice of recission in its "document bank," which WFG could have searched. The Kims argue WFG was negligent

27

because it failed to search the document bank after WFG received a copy of the notice of recission. Weller also testified, however, that its document bank is no more than "a mirror of the county's records" and that WFG does not search for the title records of a property "after a policy has been issued" unless the insured submits a request "for additional coverage" or tenders a claim. (See *State Farm*, *supra*, 143 Cal.App.4th at p. 1113 [whether a party fails to "adher[e] to certain prescribed procedures" is relevant to whether the party has the superior equitable position].)

The trial court never determined whether, or to what extent, WFG was negligent, nor did the court exercise its discretion in weighing the parties' comparative levels of fault to determine which party held a superior equitable position.[4]

---

[4] Generally, an insurer has a superior equitable position to that of the person who was "the direct cause of the loss (e.g., a dishonest employee, burglar, or fire starter)." (*State Farm*, *supra*, 143 Cal.App.4th at pp. 1112-1113.) "The insurer need only show a causal connection between the direct wrongdoer's act or omission and the loss," and the "direct wrongdoer, having caused the loss, cannot be considered an innocent party." (*Ibid.*) As one treatise has explained, "[a]rguably where the subrogated claim is based on *breach of contract*," like WFG's claim, "the breaching party is *directly responsible* for the loss for purposes of the superior equities doctrine." (Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group) ¶ 9:61.11; see *Fireman's Fund Ins. Co. v. Wilshire Film Ventures, Inc.* (1997) 52 Cal.App.4th 553, 558-559 [insurer of leased camera equipment had a superior equitable position to the lessee because the lessee "was obligated to return the equipment or pay for it, . . . did neither, and [was] therefore in breach of its contractual obligation"].)

Therefore, there is nothing for us to review. (See *Carter v. Pulte Home Corp.* (2020) 52 Cal.App.5th 571, 579 [trial court's determination whether a defendant's equitable position is inferior to an insurer's is reviewed for abuse of discretion]; *Die den v. Schmidt* (2002) 104 Cal.App.4th 645, 654 [because "the trial court should be given the opportunity to balance the equities and exercise its discretion," reviewing court would "not consider [doctrine of equitable subrogation] in the first instance"].) Moreover, because RNA did not argue in the trial court its equitable position was superior to WFG's position, RNA deprived WFG of the opportunity and incentive to present all evidence relevant to its level of fault. The record also does not reflect whether RNA held proceeds from the refund long enough after the recission such that, even if WFG was negligent in failing to discover the recission, Maggie could have recovered anything from RNA had WFG discovered the recission within a reasonable time and notified Maggie. Therefore, we decline to exercise our discretion to consider the Kims' argument for the first time on appeal.

### D. *The Kims' Remaining Arguments Are Meritless*

The Kims raise several other arguments in their opening brief, none of which has merit. First, the Kims argue the trial court erred in failing to rule in its favor on its affirmative defense of "failure to exercise ordinary care." Although not entirely clear, it appears the Kims intended to raise a comparative fault defense. (See *Yale v. Bowne* (2017) 9 Cal.App.5th 649, 657.) In their request for a statement of decision, the Kims asked the court to find Maggie "fail[ed] to exercise due diligence in ensuring that its loan was still secured" after RNA did not make the

balloon payment due at the end of the initial three-year term. Comparative fault is not, however, a defense to a cause of action for breach of contract. (*Kransco v. American Empire Surplus Lines Ins. Co.* (2000) 23 Cal.4th 390, 406-407; *Shaffer v. Debbas* (1993) 17 Cal.App.4th 33, 42; see *Considine Co. v. Shadle, Hunt & Hagar* (1986) 187 Cal.App.3d 760, 770 ["where one party has promised to perform a particular act, upon breach the injured promisee should not face a comparative negligence defense"].)

Second, the Kims argue the trial court erred in declining to rule in their favor on their affirmative defenses of failure to mitigate damages, unclean hands, and failure to state a cause of action.[5] The Kims, however, did not raise these defenses in their trial briefs or in their request for a statement of decision. When a party requests a statement of decision under Code of Civil Procedure section 632, "[f]ailure to request findings on specific issues results in a waiver as to those issues." (*Atari Inc., v. State Bd. of Equalization* (1985) 170 Cal.App.3d 665, 675.) The Kims forfeited these defenses. (See *City of Coachella v. Riverside County Airport Land Use Com.* (1980) 210 Cal.App.3d 1277, 1292 ["Having failed to specify that the statement of decision should address the issue of laches, the [defendant] is deemed to have waived its right to object to the failure of the statement of decision to do so."].)

---

[5]     On appeal the Kims contend WFG did not state a cause of action because they did not cause Maggie's loss. This contention is forfeited and meritless (at least as to Laurie). As discussed, RNA caused WFG's loss because it failed to repay the loan, and substantial evidence supported the trial court's finding Laurie was liable for RNA's conduct as an alter ego of RNA.

30

Finally, the Kims contend the trial court erred in calculating the amount of damages.  Without citing any applicable authority, the Kims assert that, because the loan provided for a balloon payment due at the end of the three-year term, no interest accrued on the outstanding principal after the end of the term, which means, the Kims say, that all of RNA's payments after the end of the original three-year term should have offset the outstanding principal owed on the loan.  Put another way, the Kims contend RNA received an interest-free loan from Maggie after it was in default at the end of the three-year term, which it could pay off at its leisure (or at least until Maggie or WFG obtained a judgment).

The court correctly ruled, however, RNA's payments to Maggie "covered interest-only payments under the Note through October 1, 2015."  The promissory note provided that RNA would be in default if it did "not pay the full amount of each payment" on its due date, including the balloon payment due at the end of the three-year term.  The note further provided that interest would "be charged on unpaid principal until the full amount of Principal [had] been paid" and that RNA would "pay interest at a yearly rate of 12.000% . . . both before and *after* any default." (Italics added.)   The trial court correctly ruled that interest on the outstanding principal continued to accrue after the default and that each of RNA's payments to Maggie covered only interest.  (See Civ. Code, § 1639 [the mutual intention of the parties at the time the contract if formed "is to be inferred, if possible, solely from the written provisions of the contract"]; *TRB Investments, Inc. v. Fireman's Fund Ins. Co.* (2006) 40 Cal.4th 19, 27 ["[t]he clear and explicit meaning of contractual provisions,

31

interpreted in their ordinary and popular sense, . . . controls judicial interpretation," internal quotation marks omitted].)

## DISPOSITION

The judgment is reversed. The trial court is directed to enter a new judgment in favor of WFG and against RNA and Laurie in the amount of $556,853.20, jointly and severally, and in favor of Jamie and against WFG. The parties are to bear their costs on appeal.

SEGAL, J.

We concur:

PERLUSS, P. J.

FEUER, J.